BANKERS TRUST COMPANY, complainant-respondent,

*v.*

BANK OF ROCKVILLE CENTER TRUST COMPANY, administrator *cum testamento annexo* of John M. Phillips, deceased; CHASE NATIONAL BANK, administrator of estate of Francis Phillips, deceased, and guardian of Helen Phillips, a minor; JAMES F. MULCAHY, guardian of Helen Frances Phillips, a minor, et al., defendants-appellants.

[Argued May 18th, 1933.   Decided September 27th, 1933.]

*Mr. W. Lindley Jeffers,* for the complainant-respondent.

*Mr. Andrew J. Whinery,* for the defendant-appellant Rockville Center Trust Company, administrator *cum testamento annexo* of John M. Phillips, deceased.

*Mr. Joseph Altman* and *Mr. Daniel DeBrier (Mr. Francis A. Lewis* and *Zachariah Chaffee, Jr.,* of the Massachusetts bar), for the defendants-appellants Chase National Bank, administrator of the estate of Francis Phillips, deceased, and guardian of Helen Phillips, a minor, and James F. Mulcahy, guardian of Helen Frances Phillips, a minor.

*Mr. John C. Reed,* for the defendant-respondent, Marian Phillips Cassidy.

The opinion of the court was delivered by

HEHER, J.

This is an interpleader suit instituted to determine the title to funds on deposit with complainant. The final decree adjudged that defendant Helen Phillips (daughter of John M. Phillips, deceased), was entitled to $29,114.74, the amount credited to her account with complainant, opened on December 20th, 1926; that appellant Chase National Bank, as administrator of the estate of her deceased brother, Francis Phillips, was entitled to $26,646.45, the balance credited to said decedent in an account opened with complainant on June 8th, 1926; and that respondent Marian Phillips Cassidy (widow of John M. Phillips), was entitled to the sum of $195,000 (with accumulated interest), deposited with complainant on January 16th, 1928, and evidenced by two certificates of deposit issued by complainant—one in the sum of $100,000 and the other in the sum of $95,000—each of which acknowledged the deposit of the sum therein stated by "Helen Francis," and provided that it shall be "payable to the order of bearer on the return of this certificate properly endorsed, with interest at four per cent. per annum if left one month."

Appellants challenge only that portion of the decree which awards the deposits exhibited by the certificates of deposit to respondent Marian Phillips Cassidy. The Bank of Rockville Center Trust Company, as administrator *cum testamento annexo* of the estate of the deceased John M. Phillips, asserts title in its testator during life, and claims the fund as his administrator. The Chase National Bank, as administrator of the estate of Francis Phillips, deceased, and guardian of his widow, Helen Phillips, a minor, and James F. Mulcahy, guardian of Helen Frances Phillips, his minor child, aver ownership of the fund in Francis, and claim title thereto through him.

Ownership of the fund represented by these certificates of deposit in Francis Phillips, at the time the moneys were deposited and the certificates issued, is established by the proofs. True, he was a minor, eighteen years of age, and was accompanied by his father when the deposit was made, but it is undisputed that he had physical possession of the moneys;

that he actually made the deposit, and arranged for and received the certificates of deposit, and that his father informed officers of the bank that these moneys were the property of his son and daughter, Helen. Francis suffered physical disability to a marked degree, and his father had the parent's solicitude for his son's future welfare. Senator Richards, the bank's president, described him as "terribly crippled, apparently from infantile paralysis," and he seemed to be twenty-one or twenty-two years old. He related the circumstances connected with the opening of the account by Francis on June 8th, 1926, with an initial deposit of $38,000, provided by his father. The parent stated that he "wanted him [Francis] to learn business ways, and that he was giving him some money to start a bank account, and wanted to open up a bank account for the son." When the senator asked, incredulously, if he intended to make a gift of this sum to his son, the father replied, "yes, I do, and I am going to open up an account for my daughter and give her an even break." Francis had complete and unquestioned dominion over this account, and from time to time made withdrawals therefrom. At the time of his death, on June 26th, 1929, the balance to his credit in this account was $26,646.45. On December 20th, 1926, the daughter, Helen, also a minor, opened an account with an initial deposit of $27,635.01, furnished by her father.

John M. Phillips opened the negotiations which eventuated in the deposit of the disputed $195,000. He inquired of Senator Richards as to the rate of interest complainant would pay on a deposit. He was informed that the clearing house rules permitted the payment of three per cent. on accounts in excess of $25,000. When Phillips insisted on a higher rate, Mr. Richards advised him that a certificate of deposit would draw interest at the rate of four per cent., and suggested that the deposit take that form. Phillips seemed content, and said: "Well, Francis and I will be up to see you." Shortly thereafter Phillips and his son called at the bank. Senator Richards relates the conversation as follows: "Mr. Phillips then said to me, 'the boy is carrying around a lot of money here; I don't want him to have it on him and be-

sides it ought to be earning interest; he has got to learn to take care of his money; I want you to fix this up so he will be getting interest.' Well, I said you mean—I think he then said to me, as I recall it, 'what is this certificate of deposit?' I said, 'it is merely a certificate;  *  *  *  a certificate of deposit simply is a statement that the bank holds for the holder of the certificate that much money and it draw four per cent. interest.' He said, 'well, that is all right; come on, kid, give the senator your money.' " Francis demurred, saying to his father, "you know somebody else knows about this." The parent, expressing unconcern, continued, "you do what the senator tells you; you give him your money," and Francis, signifying his consent, took from his overcoat pocket $195,000 in currency, and placed it on a table.

When Senator Richards directed the vice-president of the bank to prepare a certificate of deposit for this sum, John M. Phillips requested that two certificates be made, one for $100,000 and one for $95,000, explaining that "half of this belongs to his [Francis'] sister [Helen]." In response to an inquiry as to "how they wanted the certificates made out," it was suggested that "they combine the names of the two children, Helen and Francis," and two certificates were then prepared, stating that "Helen Francis" deposited the sum specified therein. Francis received the certificates, and was preparing to place them in his pocket when Senator Richards suggested that they be deposited in a safe deposit box. The Phillips' assented, and immediately repaired to the vault. Francis rented a box in his name. One of the bank's officers saw him place papers therein, but he did not know whether the certificates were among them. There is no testimony that the box was thereafter opened by Francis. No one else had authority to open it.

On July 3d, 1928, John M. Phillips died. His widow, Marian, and the named children Francis and Helen (children of a deceased wife), survived. On June 26th, 1929, Francis, at the age of nineteen years, was killed as the result of an accidental fall of an airplane. His wife, Helen, and an infant child, Helen Frances, survived.

The administrator of John M. Phillips asserts that the fund represented by the certificates of deposit was the property of its testator; that the possessor of the certificates held the same in trust for him, and that his administrator is now entitled to the fund. Respondent Marian Phillips Cassidy claims that this fund, at the time of its deposit, was the property of her deceased husband; that prior to his death, her husband transferred title to the certificates to her for a valuable consideration, and that the moneys were properly awarded to her. Title was transferred, so she claims, by the delivery of the certificates, but she was unable to produce them. She explained that they had been accidentally lost or destroyed. It is admitted that they bore no endorsement. The widow contends that they were payable to "bearer," and that endorsement was not a requisite to the passing of title.

It is conceded that John M. Phillips was the source of the fund evidenced by the certificates of deposit, and the first question presented is whether he parted with the title when he delivered possession of the moneys to his son. That question must be resolved in the affirmative. The proofs lead irresistibly to the conclusion that there was a gift *inter vivos* of this fund. The requisites of a valid gift *inter vivos* are: *first,* a donative intent on the part of the donor; *second,* an actual delivery of the subject-matter of the gift unless it be a chose in action, like a certificate of shares of stock or evidence of indebtedness, in which case the delivery must be of that variety of which it is most capable, and *third,* the donor must strip himself of all ownership and dominion over the subject-matter of the gift. *Taylor* v. *Coriell, 66 N. J. Eq. 262; Swayze* v. *Huntington, 82 N. J. Eq. 127, 133; affirmed, 83 N. J. Eq. 335; Besson* v. *Stevens, 94 N. J. Eq. 549, 556; Stevenson* v. *Earl, 65 N. J. Eq. 721; Nicklas* v. *Parker, 69 N. J. Eq. 743; affirmed, 71 N. J. Eq. 777; Conners* v. *Murphy, 100 N. J. Eq. 280.*

The evidence clearly establishes a donative intent. The declarations of the donor to Senator Richards signify such an intention. This fund was a gift to his children, in whose judgment and good sense, apparently, he had implicit con-

fidence. It was dictated by natural love and affection. It was inspired by the most powerful of human emotions—the love of a father towards his children. In the words of a contemporary philosopher, the love of a father toward his child is perfect love—pure and distinterested. The father does for his son what he would do for no one else. His son is his creation, grown up by his side day by day, a completion and a complement of his own being. The old man lives again in the young man. The past sees itself in the future. He who has lived sacrifices himself for him who is to live. The father lives in the son, and feels himself exalted. This was not the first time that he made gifts of large sums to his children. He had deposited $38,000 to the credit of his son, and in excess of $27,000 to the credit of his daughter. That each of these transactions had all the elements of a gift is not challenged here. The vice-chancellor so found, and the decree in this respect is not assailed.

The transaction in question is not essentially different from the gifts of the respective sums deposited to the credit of the children. The deposit took the certificate form only because a higher interest rate was desired. The certificates bore interest at the rate of four per cent., while a deposit in an inactive account would earn interest at the rate of three per cent. Moreover, the statement in the certificates that the deposits were made by "Helen Francis" is a recognition of ownership of the fund by the children. It cannot be questioned that there was an actual delivery of the subject-matter of the gift, and there is ample evidence that the donor stripped himself of all ownership and dominion over the fund. The certificates were delivered to Francis. There is no evidence tending to show that his father did not intend to divest himself of ownership of the fund, and therefore nothing at variance with his declaration to Senator Richards that the fund was the property of his children. The proofs are silent as to his financial means, but he was evidently a man of great wealth.

Counsel for the widow concedes that she and her husband lived in a state of marital infelicity. He characterized the

relationship as "an antagonistic attitude and relationship." Asserting that his client derived title to the certificates of deposit from her husband, he admits that the latter "did not want to give them to her; he *had* to," and he inquires, "was it not this that he was attempting to avoid when he purchased the certificates, using his son as a blind?" This emphasizes rather than denies the existence of a donative intent. It recognizes the predominant desire of the father to make provision for his children. It does not appear that he was in ill health, but he died shortly after. The thing foremost in his mind was the future of his children. The urge to provide for them in this fashion was undoubtedly the stronger because their mother was dead. He was then beset with difficulties —on one hand, domestic strife; on the other, governmental agencies demanding an accounting of moneys claimed to be due. He was determined to make what he conceived to be adequate provision for his children; hence, the gift of the fund now in litigation. He undoubtedly regarded this as insuring the economic security of his children, in the event that disaster overtook him.

But if the theory of gift springing from this motive is rejected, the more probable alternative hypothesis is that the transfer of the fund was devised to defeat the claims of creditors. Numerous claims were presented to the estate of John M. Phillips. Two were in large sums. One of these was a claim of the federal government for unpaid income taxes for the years 1923 to 1926, both inclusive, amounting to approximately $1,375,000. No principle of law is better settled in this state than that a conveyance or transfer of property, designed in fraud of creditors, is good *inter partes*. No doctrine of law rests upon higher principles of morality, or more obvious considerations of public policy, than that which declares that a transfer of property made in fraud of creditors, while void as to them, is good between the parties and their heirs-at-law and legal representatives. *Cutler* v. *Tuttle, 19 N. J. Eq. 549, 562; Pendleton* v. *Gondolf, 85 N. J. Eq. 308, 315; Sayre* v. *Lemberger, 92 N. J. Eq. 656; Semenowich* v. *Melnyk, 93 N. J. Eq. 615; Doughty* v. *Miller, 50 N. J. Eq.*

*529; Hildebrand* v. *Willig, 64 N. J. Eq. 249; Schwalber* v. *Ehman, 62 N. J. Eq. 314.*

Under the circumstances here existing, the presumption is that a gift was intended. "The law will raise the presumption of a gift by father to son from circumstances where it would not be implied between strangers." *Ridgway* v. *Ex'rs of English, 22 N. J. Law 409; Betts* v. *Francis, 30 N. J. Law 152; Lister* v. *Lister, 35 N. J. Eq. 49; affirmed, 37 N. J. Eq. 331. Cf. Prisco* v. *Prisco, 90 N..J. Eq. 289; Bertolino* v. *Damario, 107 N. J. Eq. 201.* The legal inference arising from advancements of money by a parent to or for the benefit of his child, when unexplained, is that they were by way of gift or advancement. *Jenning* v. *Rohde, 99 Minn. 335; 109 N. W. Rep. 597; Thurber* v. *Sprague, 17 R. I. 634; 24 Atl. Rep. 48; Hicks* v. *Keats, 4 B. & C. 69; 10 E. C. L. 277; 107 Reprint 985; Cox* v. *Bennett, 18 Wkly. Rep. 519; 46 C. J. 1321.* The relation between parent and child, whether adult or minor, naturally leads to gratuitous conveyances of land and gifts of personal property between them, especially from the parent to the child. Such conveyances require no other consideration than parental affection and duty. Less positive and unequivocal testimony is required to establish the delivery of a deed or gift from a father to his children than between persons who are not related; and in cases where there is no claim of fraud or undue influence very slight evidence will suffice. *20 R. C. L. 588.*

To overcome such presumption of gift from a father to his son, the proof offered to accomplish it must be certain, definite, reliable and convincing, and leave no reasonable doubt as to the intention of the parties. *McGee* v. *McGee, 81 N. J. Eq. 190; Prisco* v. *Prisco, supra; Bertolino* v. *Damario, supra; Betts* v. *Francis, supra.* The proofs which shall raise a resulting trust, or rebut the presumption of a gift or settlement in the case of a child or wife, must be of facts antecedent to or contemporaneous with the purchase, or else immediately afterwards, so as to be in fact part of the same transaction. A resulting trust cannot be raised from matters arising *ex post facto. Cutler* v. *Tuttle, supra; Lister* v. *Lister, supra;*

*Prisco* v. *Prisco, supra; Bertolino* v. *Damario, supra.* The intention of the parties at the time of the conveyance or transfer controls. *J. W. Pierson Co.* v. *Freeman, 113 N. J. Eq. 268; Doughty* v. *Miller, supra; Frink* v. *Adams, 36 N. J. Eq. 485.* When a gift is completed by delivery and acceptance of the chattel, it is irrevocable. *Fretz* v. *Roth, 70 N. J. Eq. 764; Betts* v. *Francis, supra.*

It is insistently asserted that Francis, while conversing with a government agent (of the treasury intelligence service), made admissions which clearly negative a gift to him of the fund. He quoted Francis as saying that "they [the certificates] had been purchased *by* him for his father." It may be that Francis was inaccurately quoted. The witness may have misunderstood him. He had previously testified that Francis told him, in this conversation, that his mother had two certificates of deposit that had been purchased *by* his father. It may well be that Francis intended to convey merely the information that his father was the source of the fund thus deposited.

However, such *quasi* admissions are entitled to little weight. The rule in some jurisdictions is that "by mere admission infants are not bound; they can neither make them nor authorize any other person to make them for them." *Knights Templars, &c., Indemnity Co.* v. *Crayton, 209 Ill. 550, 563.* The prevailing and, it would seem, the better rule, however, is that the admissions of an infant are receivable, but are to be cautiously weighed. *Atchison, &c., Railway Co.* v. *Potter, 60 Kan. 808; 58 Pac. Rep. 471; Chicago City Railway Co.* v. *Tuohy, 196 Ill. 410; 63 N. E. Rep. 997; 58 L. R. A. 270; Gebhardt* v. *United Railways Co., 220 S. W. Rep. (Mo.) 677; 9 A. L. R. 1076; 2 Wigm. Ev. (2d ed.) 513; 1 R. C. L. 488.* And there are inherent weaknesses in this character of testimony which have received general recognition. "The great possibilities of error in trusting to recollection-testimony of oral utterances, supposed to have been heard, have never been ignored; but an antidote is constantly given by an instruction to the jury against trusting overmuch to the accuracy of such testimony." *4 Wigm. Ev. (2d ed.) 463.* And in

*Earle* v. *Picken, 5 C. & P. 542,* we find the folowing: "In the course of this circuit, Mr. Justice Parke several times observed that too great weight ought not to be attached to evidence of what a party has been supposed to have said, as it very frequently happens, not only that the witness has misunderstood what the party has said, but that by unintentionally altering a few of the expressions really used, he gives an effect to the statement completely at variance with what the party really did say." Chief-Justice Redfield, in a note to *Greenl. Evid. (12th ed.)* § *200,* said: "In a somewhat extended experience of jury trials we have been compelled to the conclusion that the most unreliable of all evidence is that of the oral admissions of the party. And especially where they purport to have been made during the pendency of the action, or after the parties were in a state of controversy." Mr. Justice Neilson, in *Tilton* v. *Beecher, 2 Abbott's Rep. 837,* said: "Perhaps the best statement of that [the general principle] has been given in *Starkie on Evidence,* to the effect that this kind of testimony is dangerous, first, because it may be misapprehended by the person who hears it; secondly, it may not be well-remembered; thirdly, it may not be correctly repeated." Professor Wigmore further observed (*4 Wigm. Ev. 465*) that "verbal precision is of course important to the correct understanding of any verbal utterance, whether written or oral, because the presence or absence or change of a single word may substantially alter the true meaning of even the shortest sentence." And he cites illustrations which serve to show the inherent possibilities of vital error on individual words, and the consequent danger of receiving testimony of this character.

Under the circumstances here existing, this alleged admission is entitled to little, if any, weight in determining the issue presented. Francis was then a lone figure struggling in the quagmire of difficulties which beset him upon his father's death. He was a conspicuous figure in the income tax proceeding instituted by the government to collect taxes claimed to be due from his father. The clouds of adversity which had settled upon his father before his death descended upon him. He inherited his trials and tribulations. He eventually found

himself cited for contempt for his refusal to answer questions propounded by a federal grand jury. It was a suddenly precipitated crisis in his affairs. He was an immature youth. He was bereft of his father's advice and guidance. His mother was dead. The possession of the money given by his father undoubtedly seemed of little importance compared with the uncertainties ahead—with the government officers and others claiming the status of creditors in hot pursuit of property that emanated from his deceased father.

This alleged admission was hardly sufficient to overcome the presumption of a gift. Certainly, it does not meet the direct, positive and convincing evidence of a gift of the fund. And there was no other evidence in the case that countervails the proof of a solemnly declared gift. In cases such as this the subsequent acts and declarations of the parent are not evidence to support the trust here asserted, "although subsequent acts and declarations of the child may be so; but, generally speaking, we are to look at what was said and done at the time." *Lister* v. *Lister, supra.* The proofs therefore establish a gift *inter vivos* of the fund, and this disposes of the contention of the administrator of John M. Phillips, and his widow, that decedent retained ownership of the fund.

The widow asserts title derived from her deceased husband. It is not contended, and there is no evidence tending to show, that Francis passed title to the fund to his father subsequent to the making of the gift, either by endorsement or delivery of the certificates of deposit, or otherwise. The widow insists, however, that the certificates were negotiated and transferred to her by her deceased husband under circumstances that constituted her a holder in due course for value, without notice of any infirmity in the instrument or defect in the title of her husband *3 Comp. Stat. p. 3741.* There was no proof of a consideration for the alleged transfer of the certificates to her. She averred in her answer and statement of claim that her husband was indebted to her for moneys loaned in the sum of $300,000, and that the certificates of deposit were given to her in part payment of this alleged loan. No proof was offered in support of this allegation. She was allowed

to testify, over objection, that she "gave" a consideration for the certificates, but she was not permitted to specify its character. The learned vice-chancellor sustained an objection to questions propounded to elicit this information, on the ground that the lips of this party were sealed by the fourth section of the Evidence act. *2 Comp. Stat. p. 2218.*

No rational distinction can be drawn under this statute between testimony that a consideration passed and evidence of its nature. The bar of the statute extends to all transactions with, or statements by, the testator or intestate represented in the action, unless the representative offers himself as a witness on his own behalf, and testifies to a transaction with or statement by his testator or intestate. The design of the rule of evidence prescribed by this statute is to produce equality between the parties, by silencing the one who may, by his own mouth, be able to testify to transactions and conversations with the decedent, possibly to the disadvantage of his estate, unless the representative of that estate should, by his own conduct, remove the interdict. *Hoffman* v. *Maloratsky, 112 N. J. Eq. 333.* The test laid down for escertaining what is a "transaction with" the deceased, within the intendment of the statute, is "to inquire whether, in case the witness testified falsely, the deceased, if living, could contradict it of his own knowledge." *Van Wagenen* v. *Bonnot, 74 N. J. Eq. 843; Campbell* v. *Akarman, 83 N. J. Law 567.* Measured by the test thus prescribed, this evidence was inadmissible.

But the widow insists that the mere possession of a negotiable instrument by the endorsee, or by the transferee, where no endorsement is necessary, imports *prima facie* that he is the lawful owner, and that he acquired it for value, and without notice of any defect in the title. The difficulty here is that it rests upon the false premise that the widow was the possessor of the certificates. She was unable to produce them. She testified that she acquired possession of them sometime in January, 1928, and that she carried them constantly on her person until January 26th, 1929, when she placed them in her safe deposit box in a bank in Rockville Center, Long

Island. In April, 1930, she destroyed some papers deposited in a safe deposit box in this bank (she had two boxes at the time). When she examined the box later that month, she discovered the certificates were missing. She expressed the opinion that she destroyed them by mistake on her prior visit. In this connection, it is significant that Francis had possession of the $95,000 certificate in September, 1928. He sought to cash it at complainant bank. When informed that the federal government had placed a lien on the fund, he asked for a partial payment, so that he could retain counsel in New York to defend him in the contempt proceedings resulting from his alleged refusal to testify before a federal grand jury. True, the revenue agent who conversed with Francis said the widow produced what purported to be the certificates when he called upon her in January, 1929. But this, for obvious reasons, does not bring the case within the rule invoked by the widow. She was not the possessor of the certificates at the time she sought to establish her claim of title, and therefore was unable to make out, by their production, a *prima facie* case of ownership for value. It is singular, indeed it is incredible, that with the existing discordant family relations, the widow would entrust to her stepson this certificate which her counsel insists was payable to bearer, and it is significant that she assigned no reason for delegating to Francis authority to cash the certificate. Incidentally, the widow does not explain why she carried these certificates, which she asserts were payable to bearer, on her person until January, 1929, and then placed them in a safe deposit box.

Assuming, however, that the rule thus invoked applies, and that a *prima facie* case was made out, the presumption that she was a holder for value was rebutted by the proofs. Senator Richards testified that two or three days after the certificates were issued, John M. Phillips informed him over the telephone that the certificates had been stolen, and asked "what he [Phillips] was going to do?" Within a week the senator communicated with Phillips by telephone, and inquired whether he had found the certificates. He replied that

his wife (referring to her by a term that negatived the existence of either love or respect) "has got them," and that "he had had to give them to her." Thus the presumption of consideration, if not ownership, was rebutted, and the widow was put to her proofs that she was a holder for value, and in this she failed utterly. Although it is intimated in the widow's brief in reply that these statements of John M. Phillips were not, under the circumstances, admissible, this point was not made at the hearing, and for the obvious reason, it would seem, that the testimony was regarded by the widow as establishing her title to the certificates.

The case is barren of proof tending to show that Francis transferred the certificates to his father, and title in the latter, at the time of the alleged transfer to the widow, is therefore not shown. Section 59 of the Negotiable Instruments act provides that "every holder is deemed *prima facie* to be a holder in due course, but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course." *3 Comp. Stat. p. 3741.*

But assuming that Francis transferred the certificates to his father by endorsement or delivery, or otherwise, such transfer was voidable, and upon avoidance title to the fund evidenced by the certificates was revested in him. This is a privilege of infancy. *LaRosa* v. *Nichols, 92 N. J. Law 375; Casey* v. *Kastel, 237 N. Y. 305; 142 N. E. Rep. 671;. 31 A. L. R. 995.*

It has been held in other jurisdictions that an infant is not precluded from disaffirming his endorsement or assignment of a negotiable instrument by the provision of section 22 of the Uniform Negotiable Instruments law (*3 Comp. Stat. p. 3738*), that his endorsement passes the property therein. *Murray* v. *Thompson, 136 Tenn. 118; 188 S. W. Rep. 578; Strother* v. *Lynchburg Trust and Savings Bank, 155 Va. 826; 156 S. E. Rep. 426.*

This section has been construed as merely providing that the endorsement of an infant is not void, and that his inca-

pacity is not a defense in favor of prior parties, but does not take away the infant's right to disaffirm his endorsement and recover the instrument even against an innocent endorsee for value. In *Murray* v. *Thompson, supra,* it was said that the purpose of this section was to render the transaction voidable rather than void, and that "it was not intended to provide that the endorsee should become the owner of the instrument by title indefeasible as against the infant, or to make the act of endorsement an irrevocable one."

However, this question does not arise in the instant case. The rights of an innocent endorsee for value are not involved. The proofs do not show that the infant's transfer, if such were made, was supported by a consideration, and, as pointed out, there is no evidence that the widow is a holder for value. And no contract of an infant, in whatever form it may be put, whether in that of a promissory note or otherwise, can, on account of his want of capacity to make a valid execution of it, so import a consideration as to cast upon him the burden of proving a want of consideration, in an action brought upon it, or dispense with proof of an adequate consideration to support it, as against him or his representatives. *3 R. C. L. 930.* The construction of section 22 suggested by respondent would deprive an infant of the right of avoidance of a gift of a negotiable instrument, even though, as in the instant case, the donee was still in possession of the paper. The law jealously guards the rights and interest of infants. They are wards of the state. It is not to be presumed that the legislature intended to overturn the settled and salutary rule of law that an infant's gift is voidable. *Casey* v. *Kastel, supra.*

The infant's personal representatives may disaffirm. In the instant case the infant's administrator, by formal notice served after the entry of the final decree, revoked any transfer of the certificates proved or alleged to have been made by the infant. But this was unnecessary. There is no prescribed form or ceremonial. *14 R. C. L. 236, 237.* The filing of an answer and statement of claim by the administrator of Francis, asserting ownership of the fund in its decedent at the time of his death, was a sufficient disaffirmance.

It follows that, at the time of his death, Francis was entitled to one-half of the fund, and held the remaining half in trust for his sister, Helen. There is no proof that she knew of the gift to her, but this was not an essential. If a trust was in fact declared, neither delivery of the subject-matter, nor of the trust agreement, nor notice to the *cestui*, was requisite for its validity. *West Jersey Trust Co.* v. *Read, 109 N. J. Eq. 475, 477; In re Farrell, 110 N. J. Eq. 260, 263.*

The decree will be reversed, and the cause remanded for the entry of a decree in conformity with this opinion.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, CASE, BODINE, DONGES, HEHER, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, DILL, JJ. 13.