KOSCIUSZKO BUILDING AND LOAN ASSOCIATION, a corporation of the State of Delaware,

*vs.*

STANLEY KANZAN, also known as Stanley Kaluzny, Administrator of the Estate of Cecelia Kanzan, also known as Cecelia Kaluzny, Deceased, and ELEANOR MARKOWSKI.

*New Castle, January 22, 1947.*

*Anthony F. Emory,* for complainant.

*Joseph Donald Craven,* for Stanley Kanzan, a defendant.

*Charles L. Paruszewski,* of the firm of Killoran & Van Brunt, for Eleanor Markowski, a defendant.

SEITZ, Vice-Chancellor: This court must decide which of two parties is entitled to receive certain money representing the cash value of 10 shares of building and loan stock.

A chronological statement of the undisputed facts is probably the best way to approach this case.

On April 1, 1939, the claimant Eleanor Markowski (hereafter called Eleanor) subscribed for 10 shares of stock in the Kosciuszko Building and Loan Association in the name of her daughter Cecelia Markowski (hereafter called Cecelia). At this time Cecelia was about 19 or 20 years of age and was working regularly and turning her entire wages over to her mother, Eleanor. The only written evidence given to a subscriber to such building and loan stock is a passbook, which in this case was in the name of the daughter, Cecelia.

Some time in 1941 or 1942 Cecelia married Stanley Kan-

zan (hereafter called Stanley) the other claimant here involved, and shortly thereafter Cecelia presented the passbook to an officer of the Building and Loan Association and requested that the name be changed to Cecelia Kanzan. This change was made. After Cecelia's marriage, she and her husband lived with her mother and father. Very shortly after the marriage Cecelia took sick and discontinued working. After Cecelia married Stanley, it was apparently agreed that Stanley would support the household and he did so up until the death of his wife Cecelia in January 1944. Apparently the entire income of Eleanor and her husband, who did not work, came from the earnings of Cecelia and her brother. During the time when Stanley and Cecelia were married the household was largely supported by Stanley because Cecelia was sick and her brother was in the service.

Stanley was appointed administrator of his wife's estate, and this case involves a dispute between Stanley as administrator and Eleanor, his mother-in-law, as to the ownership of the 10 shares of building and loan stock registered in the name of Cecelia Kanzan. The claimant Stanley contends that the shares belonged to his wife Cecelia, and consequently he is entitled to receive the interest represented thereby as the administrator of her estate. The other claimant Eleanor—Stanley's mother-in-law—claims that while the shares were taken in her daughter's name they, nevertheless, belong to her.

Both Stanley and Eleanor made a claim on the Kosciuszko Building and Loan Association for the cash value of the shares. The Building and Loan Association, although admitting that it owed one of the claimants the money, could not determine to whom to pay it, and as a consequence filed this bill of interpleader to force the rival claimants to wage battle directly. Thereafter, by order of this court, the Building and Loan Association was directed to deposit the money in court, and upon doing so was discharged. The real claimants were directed to interplead and after

so doing a final hearing was held at which time conflicting and confusing oral testimony was heard on behalf of the rival claimants.

Let us now see how the controversial evidence fits into this picture. The evidence shows that Eleanor alone subscribed for the shares and had the passbook put in Cecelia's name on April 1, 1939. At this time Cecelia, who was about 19 or 20 years of age, was working and turning over her entire wages to Eleanor. At the same time, Eleanor subscribed for 10 shares of the building and loan stock and placed the passbook therefor in the name of her son Boniface. At the same time Boniface, who was then about 25 years of age, was also working and turning over his entire wages to Eleanor.

The evidence clearly demonstrates that at all times up to the marriage of Cecelia in late 1941 or early 1942, Eleanor supplied the money for the monthly payments due on the building and loan shares held in the names of Cecelia and Boniface. The rival claimants are in sharp disagreement as to whose money was used to make the payments on the shares. As to the money earned by Cecelia up until she became 21 years of age, I believe the evidence clearly demonstrates that Eleanor—as Cecelia's mother—was entitled to such wages under the existing law, there being no evidence which would render operative any so-called exception to this rule. *Revised Code of Delaware* 1935, § 3577; *Farrell v. Farrell*, 3 *Houst.* 633. As to the wages earned by Cecelia after coming of age and before her marriage, I conclude that the evidence demonstrates that the money was turned over to Eleanor absolutely. In other words, I believe Eleanor received "title" to the money whether it be on the theory that Cecelia though over 21 years of age was still unemancipated, see *Brown v. Ramsay*, 29 *N.J.L.* 117, or on the theory that she made gifts of the money to her mother. The mores which govern this particular family make it an "unwritten law" that the unmarried children living at

home shall turn over their wages to their parents, whether the children are of age or not.

I have concluded and shall proceed on the assumption that in legal contemplation Eleanor made the monthly payments on the building and loan shares with her own money up until Cecelia's marriage.

While the evidence is in conflict and somewhat indefinite, I conclude that Stanley supplied the money to make the payments on the shares after he married Cecelia and up until her death. I base my conclusion on the fact that Stanley was the only wage earner at the home during this period since Eleanor's husband was not employed, Boniface was in the service, and Cecelia was unable to work. However, I do not believe the source of the money during this period is at all decisive of the question of whether or not Eleanor made a gift of the shares to Cecelia, although it does tend to indicate that Eleanor realized Cecelia had some interest in the shares.

We have, therefore, this situation: A mother takes out 10 shares of building and loan stock in her daughter's name in 1939, and makes all monthly payments thereon with her own money for upwards of four years—though much more than enough money to make these payments came to her from her daughter's wages. Thereafter, the payments were made from money supplied by her son-in-law.

The parties are in sharp disagreement as to who had "possession" of the passbook. Up until Cecelia's marriage at least, it appears that the passbook was under what I might loosely term the "control" of Eleanor. After Cecelia's marriage, the passbook was apparently kept on the dresser in the bedroom occupied by Cecelia and her husband. It appears that the question of "possession" of the passbook was of no moment to the parties prior to Cecelia's death, and I conclude that it would be unrealistic to permit the decision in this case to turn on the question of physical

possession of the passbook. Moreover, the question of "possession" of the passbook should not be determinative of this case because the children, based on an "old country" custom tacitly recognized that the mother was in control of the passbook, like most everything else in the home, regardless of its physical location therein.

The real question to be determined is whether Eleanor intended to make a gift of the shares to Cecelia in April, 1939, or at any time up to Cecelia's death. This question can be answered only by attempting to ascertain the intent with which Eleanor placed the shares in Cecelia's name. Ascertaining intent here is rendered particularly difficult because the claimant Eleanor had to testify through an interpreter, and the opposing interest is only derivative in that the person who would otherwise be representing the opposing interest is dead.

Before entering into a further discussion of the testimony, I must point out that in my opinion the fact that Eleanor placed the passbook in Cecelia's name is, under the circumstances, *prima facie* evidence of an intent to make a gift at that time, and imposes on Eleanor the burden of showing that such was not her intent. See generally *Rauhut v. Reinhart*, 22 *Del. Ch.* 431, 180 *A.* 913. Nor do I believe the delivery of physical "possession" of the passbook to Cecelia was a necessary prerequisite to the making of a gift here, especially when Cecelia was advised that the shares had been taken out in her name. By parity of reasoning, *Holladay. v. General Motors Corp.*, 28 *Del. Ch.* 378, 43 *A.* 2d 844; affirmed *post p.* 572, 51, *A.* 2d 584, supports this conclusion.

What does the testimony show with respect to the intent with which Eleanor placed the shares in Cecelia's name? Eleanor stated her version in the following ways:

"Q. In what names were those applications made?

"A. In the name of my daughter, Cecelia. I have saved money in her name.

"Q. Why did you take out these shares in your daughter's name?

"A. I tried to save for my daughter.

"Q. Who had the possession of the pass book?

"A. They were in my possession.

"Q. Did Cecelia ever have possession of this book?

"A. When I had no time, in a year or two, I gave her possession of the book.

"Q. You say you gave her possession of the book. Was that permanent possession of the book?

"A. I was saving in her name; within the eleven years it would come in maturity I would give her as a present.

"Q. Did you actually give her possession of the book to keep permanently?

      *   *   *   *   *   *

"A. I naturally would give it to her if she would live, and I was saving it for her.

"Q. Who had the book?

"A. I did.

"Q. Did Cecelia ever have the book?

"A. At no time. She would pay for it and return me the book.

      *   *   *   *   *   *

"Q. When your daughter got married what if anything took place relative to the pass book?

"A. There is nothing happened, and I have asked my daughter Cecelia what would happen with the book and she says she had paid before and would keep on paying.

"Q. Who said that?

"A. Cecelia.

"Q. Did you have any conversations with your son-in-law?

"A. He knew all about it, and he knew I was saving for her.

      *   *   *   *   *   *

"Q. Did you have this Building and Loan issued in the name of your daughter, Mrs. Markowski?

"A. In Cecelia, yes sir.

"Q. Why did you have that stock in her name?

"A. In case I would die I wanted her to get that stock so no-body else would get it.

"Q. Was it your thought, Mrs. Markowski, that this was your stock, or your daughter's stock?

"A. It was for my daughter.

\* \* \* \* \* \*

"Q. As a matter of fact, Mrs. Markowski, didn't you tell your son-in-law that you didn't feel that he and your daughter had been married long enough for him to get that Building and Loan after her death?

"A. Yes.

"Q. You did tell him that?

"A. Yes.

\* \* \* \* \* \*

"Q. You stated when Mr. Craven was asking the questions that these shares were bought for your daughter. Now will you please explain that.

"A. I bought the stock for her to help her at some time to get a home.

"Q. Why didn't you buy the shares in your own name?

"A. In case I should die there would have been trouble, and per-haps my husband would use it."

Boniface, Eleanor's son, called as a witness on behalf of Eleanor testified without objection as follows:

"Q. When your mother first told you about these shares of stock did she tell you why she put them in your own name and in Cecelia's name?

"A. The simple reason she put them in our names—she wanted to show her appreciation, a sort of donation, just because we turned over all our earnings, and in case she would die, why we would have some sort of security.

\* \* \* \* \* \*

"Q. She did say she bought this for you in appreciation of your turning the money over to her.

"A. For both of us.

"Q. You and your sister both?

"A. Yes."

Let us look to the quoted testimony of Eleanor and see whether she rebutted the *prima facie* evidence of an intent to make a gift, which I have concluded follows from the placing of the shares in her daughter's name. Eleanor's testimony demonstrates beyond reasonable doubt that she intended to make a gift of the building and loan shares to Cecelia at some time under some circumstances. The real question is to determine whether in law the gift was conditional or absolute. It is impossible to answer this question with any real assurance because the testimony demonstrates that Eleanor in all probability did not entertain any conscious intent with respect to this matter. We must, therefore, construct an intent based on the evidence adduced by the parties.

The best reading I am able to give the testimony leads me to conclude that Eleanor should be said to have intended to make an unconditional gift of the shares to Cecelia. I base my conclusion on Eleanor's testimony that she was saving money for Cecelia in Cecelia's name so that Cecelia could some day get a home. I further rely on Eleanor's testimony that she wanted to make certain that if she died her daughter, and not her husband, would get the shares. Moreover, Eleanor's son Boniface testified that Eleanor placed the 10 shares in Cecelia's name and the other 10 shares in his name as "a sort of donation" in appreciation for their turning their wages over to her. The cumulative effect of this evidence is to indicate that Eleanor was giving the shares to Cecelia.

I conclude that the quoted testimony which seems to indicate that the gift of the shares was conditional does not have that implication when considered in connection with the type of gift involved. The gift was of building and loan shares which called for monthly payments over a period of several years. Eleanor naturally considered herself obligated to make the monthly payments because obviously Cecelia could not make the payments when she

was giving Eleanor all of her wages—which incidentally were not insubstantial. Eleanor naturally considered that her obligation to make the payments ran until the shares matured, and her testimony that the shares would be Cecelia's when they matured must be considered in the light of her continuing obligation under the circumstances. I am not convinced that Eleanor intended that the gift of the shares to Cecelia was to be conditional.

Some further testimony is of real importance in supporting my conclusion. Stanley claimed that when he asked Eleanor for Cecelia's passbook after her death Eleanor said that he and Cecelia had not been married long enough for him to get the building and loan shares. Eleanor admitted on cross-examination that she so stated to Stanley. It is evident that Eleanor's feeling that Stanley had not been married to Cecelia long enough to be entitled to the shares influenced Eleanor's thinking greatly with respect to her testimony as to the intent with which she subscribed for the shares in Cecelia's name. The fact that she entertained this attitude tends to cast a cloud over her testimony with respect to her intent. No matter how meritorious such an attitude may be in the nonjudicial field, it cannot aid the claimant here but, on the contrary, is detrimental to her case because it demonstrates that Stanley's claim to the shares was denied by Eleanor, not because they had not been given to Cecelia, but because it was felt that it would be unfair for Stanley to get them under the circumstances.

I give no weight to the testimony of Eleanor's daughter, Antoinette, because of her obviously hostile attitude and the unrealistic character of her testimony. I find her testimony particularly unconvincing because under the circumstances it would be unreasonable to suppose that the remarks ascribed, especially to Cecelia, were in fact made. Thus, Antoinette testified that two months before her death Cecelia, who was then ill, said to her mother while she

was present, " 'Mother, you keep this book. This is my name, Cecelia Monica Markowski, but I have changed it, but this book is yours.' ". Since Eleanor and her son Boniface both testified that Eleanor kept possession of the passbooks at all times, except when one of the children was given the books to make a payment (though I don't believe this was the case), it does not make sense for Cecelia to tell her mother to keep the passbook, which she presumably already had. This is especially true since there is no testimony showing that Eleanor sought to turn the passbook over to her daughter. Because it is unconvincing, I have rejected the testimony of Antoinette in reaching my conclusion in this case.

The evidence presented by the claimant Eleanor is indecisive and indefinite, and is at least as consistent with an intent to make an absolute gift as with an intent to make a conditional one. Moreover, it has been stated that where the alleged gift is from parent to child less evidence is necessary to establish an intention to make a gift than in other cases. *Bankers' Trust Co. v. Bank of Rockville Center Trust Co.*, 114 *N.J. Eq.* 391, 168 *A.* 733, 89 *A.L.R.* 697. Furthermore, the burden of proof of showing that a gift was not intended was on Eleanor and in my opinion she failed to discharge such burden. A lack of clarity and definiteness in the proof made by Eleanor must redound to her disadvantage. See *Bankers' Trust Co. v. Bank of Rockville Center Trust Co., supra.*

I believe the intent to make a gift is sufficiently evident as well as a sufficient delivery and acceptance. I conclude that Eleanor made an unconditional gift of the 10 shares of the building and loan stock to Cecelia and that Stanley as her administrator is entitled to the proceeds representing such shares which are now on deposit in the registry of this court.

A decree accordingly will be advised.