SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**Amratlal C. Bhagat v. Bharat A. Bhagat (A-31-11) (068213)**

**Argued February 27, 2013 -- Decided January 30, 2014**

**CUFF, P.J.A.D. (temporarily assigned), writing for a unanimous Court.**

In this appeal, in the context of cross-motions for summary judgment, the Court considers whether a father adduced sufficient evidence to rebut the presumption that his transfer of stock to his son was a gift.

Amratlal C. Bhagat (A.C.) is the father of Bharat A. Bhagat (B.B.), Ranjana Bhagat, and Janaki Tailor, the wife of Nagarki Tailor (the Tailors).  In 1984, B.B., Ranjana, and the Tailors each designated a portion of their stock in ABB Properties Corporation (ABB Properties) as being held "in trust" for A.C., making A.C. the "beneficial owner" of the majority of ABB Properties shares.  On June 26, 1989, A.C. signed "DECLARATION OF GIFT" and "STOCK POWER" documents transferring certain shares of his ABB Properties stock to B.B.  The documents do not indicate that the transfer was temporary or conditional.  On that date, B.B. also signed an "OPTION TO PURCHASE STOCK" document giving A.C. the option to purchase any or all of the gifted shares at the price of $1 per share for five years.  Later that year, ABB Properties' attorney referenced A.C's transfer of stock to B.B. in a letter to A.C. and in a letter to a real estate loan officer.   In 1990, using the same set of forms as those used in the 1989 transaction, A.C. transferred additional shares in ABB Properties to B.B.  According to B.B., the purpose of this transaction was for A.C. to convey to him, by gift, all of the remaining ABB Properties shares of which A.C. was the beneficial owner.

A.C. and B.B. sued the Tailors in 1994.  The verified complaint filed by A.C. and B.B., and certified by B.B., stated that A.C. owned 104 shares of ABB Properties stock and discussed a series of corporate actions taken by A.C. and B.B. against Nagarki Tailor.  B.B. also reiterated the stock ownership distribution in the answer to the Tailors' counterclaim, and in an affidavit.  The Tailor litigation was resolved by settlement and consent order in November 1999. At some point during the Tailor litigation, A.C. hand-wrote a letter to the attorney representing A.C. and B.B. in that litigation, stating: "It is my desire since 1989 to transfer my shares of ABB Properties Inc. to my son [B.B.] Kindly do so at the earliest moment."  The record does not reveal whether any further action was taken.

On December 3, 2003, A.C. filed a complaint against B.B. asserting that he did not permanently transfer his shares in ABB Properties to B.B.  B.B. denied that A.C. owned any stock in ABB Properties.  A.C. and B.B. filed motions for summary judgment.  B.B. certified that his representation of stock ownership in the Tailor litigation accounted for the fact that the corporate books reflected A.C.'s name.  B.B. insisted, however, he was the "beneficial owner" of the stock gifted to him in 1989 and 1990 and enjoyed all of the rights of the owner of the stock.  A.C. claimed that the transfer to B.B. was designed to secure financing for a hotel venture and was not intended to be permanent.  The motion judge held that the position taken by B.B. in the earlier Tailor litigation did not preclude him from asserting that A.C. had gifted him all of his ABB Properties stock.  The judge examined the evidence advanced by A.C. to rebut the presumption of a gift from father to son and to prove his intent concerning the stock transfers "convincingly and without reasonable doubt."  The motion judge found that A.C. had failed to sustain his burden of proof to rebut the presumption of a gift, granted B.B.'s motion for summary judgment, and denied A.C.'s motion for the same relief.  The Appellate Division affirmed.  The panel found that judicial estoppel did not apply and concluded that "no rational factfinder could find that A.C. overcame the presumption that a completed gift occurred by certain, definite, reliable and convincing proof, that leaves no reasonable doubt as to the intention of the parties at the time of the gifts."  The Court granted A.C.'s petition for certification.  208 N.J. 382 (2011).

**HELD**:  A person seeking to rebut the presumption that a transfer of property from a parent to a child is a gift must show clear and convincing evidence of a contrary intent.  That person is limited to evidence antecedent to, contemporaneous with, or immediately following the transfer, and may also adduce proof of statements by the parties concerning the purpose and effect of the transfer.  Applying those principles, the evidence adduced by A.C., including

statements made by B.B. in a prior litigation regarding the ownership of ABB Properties stock, raises sufficient factual issues to defeat summary judgment in this case.

1. Pursuant to the doctrine of judicial estoppel, a party who advances a position in earlier litigation that is accepted and permits the party to prevail in that litigation is barred from advocating a contrary position in subsequent litigation to the prejudice of the adverse party. The doctrine, however, does not apply when the earlier litigation settles prior to judgment because no court has accepted the position advanced in the earlier litigation. Because the Tailor litigation settled, B.B.'s statements concerning the ownership of ABB Properties stock in that matter do not bar B.B. from claiming that A.C. gifted all of his ABB Properties stock to him in this matter. (pp. 17-19)

2. An appellate court reviewing an order granting summary judgment must review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law. That evaluation requires a review of the motion record against not only the elements of the cause of action, but also the evidential standard governing that cause of action. There are three elements of a valid and irrevocable gift: (1) actual or constructive delivery, (2) donative intent, and (3) acceptance. Although the burden of proving an inter vivos gift is on the party who asserts the claim, when the transfer is from a parent to a child, there is a presumption that the transfer is a gift. That presumption is rebuttable by evidence of a contrary intent. (pp. 19-25)

3. In Peer v. Peer, 11 N.J. Eq. 432 (Ch. 1857), the court described the quality of the evidence that would be admissible to rebut the presumption of a gift as "convincing, and of such a character as to leave no reasonable doubt as to the intention of the party." Many courts thereafter adopted a "convincing and leave no reasonable doubt as to the intention of the party" standard to rebut the presumption of a gift. In addition, the proofs advanced to rebut the presumption must be of facts antecedent to, contemporaneous with, or immediately after the transfer. Herbert v. Alvord, 75 N.J. Eq. 428 (Ch. 1909). The Herbert court also excepted from the antecedent or contemporaneous requirement statements or acts of the party to be charged with the gift. Id. at 429-30. Furthermore, this Court has found that subsequent conduct of the parties also may be given in evidence to corroborate the inference drawn from prior and contemporaneous circumstances. Weisberg v. Koprowski, 17 N.J. 362 (1955). (pp. 25-27)

4. The Court can identify no reason to depart from the standard used for more than 150 years to rebut the presumption that a transfer of property from a parent to a child is a gift. Because that standard appears to contain elements of the clear and convincing standard and the beyond a reasonable doubt standard, however, the Court discerns the need to clarify. The Court's examination of the cases suggests that the standard has been understood as, and should be, clear and convincing. The Court views other language used in prior cases as an attempt to describe the quality of evidence that will satisfy the clear and convincing standard of proof. There is no reason that a person seeking to rebut the gift presumption should be required to meet a higher standard than clear and convincing evidence. In fact, in other contexts, the clear and convincing standard is applied in circumstances affecting a person's life, liberty, ability to pursue a profession, or integrity. Therefore, a person who has transferred property to another, which raises a presumption that the transferred property was a gift, must meet the clear and convincing evidence standard of proof to rebut the presumption. The person seeking to rebut the presumption is limited to evidence antecedent to, contemporaneous with, or immediately following the transfer. A party seeking to rebut the presumption may also adduce proof of statements by the parties concerning the purpose and effect of the transfer. (pp. 27-33)

5. Applying these principles to the facts revealed in the summary judgment record, B.B.'s motion for summary judgment should have been denied. The 1989 and 1990 transfers triggered the presumption that A.C. intended to gift his ABB Properties shares to his son. Accordingly, A.C. was required to adduce evidence to defeat a summary judgment motion that raised a genuine issue of material fact regarding one, some, or all of the elements of an inter vivos gift, and those proofs had to rise to the quality required by the clear and convincing standard of proof. The motion court and the appellate panel failed to consider various statements made by B.B. that contradict his position that A.C. permanently transferred him all of his ABB Properties stock. In particular, although the prior inconsistent statements made by B.B. in the Tailor litigation do not judicially estop B.B.'s current defense, those statements may be considered admissions of a party and evidence that may impeach B.B.'s credibility. B.B. also filed certifications in this matter in which he describes A.C. as the beneficial owner of the ABB Properties stock and explains his understanding of that term. These statements create genuine issues of fact concerning whether A.C. and B.B. contemplated a permanent transfer of stock. (pp. 33-36)

The judgment of the Appellate Division is **REVERSED**, and the matter is **REMANDED** to the trial court for further proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGE RODRÍGUEZ (temporarily assigned) join in JUDGE CUFF's opinion.**

AMRATLAL C. BHAGAT,
Individually and as
Shareholder of ABB PROPERTIES
CORPORATION, A New Jersey
Corporation and as a
Shareholder of EASTERNER
MOTOR INN, INC., a New Jersey
Corporation,

    Plaintiff-Appellant,

        v.

BHARAT A. BHAGAT and CRANBURY
HOTELS, LLC, a New Jersey
Limited Liability Company,

    Defendants-Respondents.


> Argued February 27, 2013 – Decided January 30, 2014
>
> On certification to the Superior Court, Appellate Division.
>
> Joseph B. Fiorenzo argued the cause for appellant (Sokol, Behot & Fiorenzo, attorneys; Mr. Fiorenzo and Steven N. Siegel, on the briefs).
>
> Jonathan I. Epstein argued the cause for respondents (Drinker Biddle & Reath, attorneys; Mr. Epstein and Karen A. Denys, on the brief).

    JUDGE CUFF (temporarily assigned) delivered the opinion of the Court.

    This appeal arises from the purported transfer of stock in a closely held corporation between a father and son. Both

1

parties concede that when a father transfers stock to a son, a presumption of a gift arises.  The issue is whether the father adduced sufficient evidence to rebut that presumption in the context of cross-motions for summary judgment.  That issue implicates the applicable standard of proof, the nature and quality of the evidence that will satisfy that standard, and the manner in which the standard of proof governs the summary judgment analysis.  We must also determine whether a position taken by the son in earlier litigation against other family members bars his current position that his father gifted to him all of the stock in the family business.

Here, despite the urging of plaintiff and some reasoned authority elsewhere, we decline to abandon a preponderance of the evidence standard of proof in favor of the well-established clear and convincing standard.  We also reiterate that every motion for summary judgment requires the court, trial or appellate, to review the motion record against not only the elements of the cause of action, but also the evidential standard governing that cause of action.

Finally, we emphasize that the doctrine of judicial estoppel may be invoked only when a position advanced in prior litigation concerning the subject matter of the current litigation has been accepted by a court and led to a judgment in favor of that party.  If the matter is resolved by settlement,

as in this case, the circumstances warranting application of the bar do not exist. The prior inconsistent position, however, may be utilized in the current litigation as an admission and for impeachment purposes.

## I.

On December 3, 2003, Amratlal C. Bhagat (A.C.), individually and as a shareholder of ABB Properties Corporation (ABB Properties) and as shareholder of Easterner Motor Inn, Inc. (Easterner), filed a complaint against his son, Bharat A. Bhagat (B.B.),[1] Cranbury Hotels, L.L.C. (Cranbury), and various other corporate entities (collectively defendants). This action was prompted by B.B.'s creation of a new entity, Cranbury, and the transfer of a hotel and property from Easterner to Cranbury. A.C. alleged that B.B. breached a fiduciary duty owed to A.C. and converted, as his own, stock intended for A.C. A.C. also alleged B.B. fraudulently and deceitfully transferred the stock to his ownership. A.C. sought immediate access to the books and records of ABB Properties, an accounting, imposition of a constructive trust on Cranbury, appointment of a temporary receiver, and disgorgement or restitution of funds and property acquired by B.B. In the answer, B.B. denied that A.C. owned any stock in ABB Properties. In a counterclaim, defendants alleged

---

[1] For ease of reference, we refer to plaintiff as A.C. and the individual defendant as B.B.

3

that A.C. breached his obligations under power of attorney and breached the fiduciary duty owed by A.C. to B.B.

A.C. and B.B. filed motions for summary judgment. The facts, viewed in the light most favorable to A.C., are derived from the certifications submitted by both parties in support of and in opposition to cross-motions for summary judgment.

Since the early 1970s, the Bhagat family business has centered on owning and operating hotels and motels. In 1974, a corporation known as Easterner was formed to purchase and operate a Quality Inn hotel in Bordentown. The majority stockholders in Easterner were Nagarki K. Tailor and his wife Janaki Tailor (the Tailors). Janaki is the daughter of A.C. and the sister of B.B. Neither A.C. nor B.B. owned stock in Easterner at that time. In 1981, Winter Park Motor Inn, Inc. (Winter Park) was formed to purchase and operate a Quality Inn in Winter Park, Florida.[2] In 1982, Easterner purchased a Best Western hotel in Bordentown.

ABB Properties was also formed in 1981. Winter Park and Easterner became wholly owned and operated subsidiaries of ABB Properties.[3] As of 1984, the Tailors and B.B. each owned one

_____

[2] The record does not reflect the composition of the stockholders in Winter Park.

[3] ABB Properties held all fifty shares of Class-A voting stock and all 200 shares of Class-B non-voting stock of Easterner and all 100 shares of Class-A voting stock and all 600 shares of Class-B non-voting stock of Winter Park.

4

hundred shares of Class-A voting stock and 350 shares of Class-B non-voting stock in ABB Properties. Ranjana Bhagat, sister of Janaki Tailor and B.B., owned 100 shares of Class-B non-voting stock in ABB Properties. A.C. owned no stock in ABB Properties at that time.

In 1984, A.C.'s attorney, James P. MacLean, III, drafted trust documents that B.B., the Tailors, and Ranjana each signed; the documents designated a portion of each child's shares in ABB Properties as being held "in trust" for A.C. B.B. and the Tailors each placed 52 shares of Class-A voting stock and 188 shares of Class-B non-voting stock in trust for A.C. Ranjana placed all one hundred shares of her Class-B non-voting stock in trust for A.C.

In a December 4, 1984 inter-office memorandum, MacLean wrote that he had "dictated a very simple form of authorization and direction in which each of the boys acknowledges that 52 shares of voting and 188 shares of non-voting [stock] are held in trust for A.C. Bhagat as the beneficial owner and that on Bhagat's request I am authorized and directed to transfer those shares to A.C. Bhagat."

A.C. thus became the "beneficial owner" of 104 shares of voting stock, constituting a majority interest in ABB Properties. B.B., Ranjana, and the Tailors remained the owners

5

"on the books" because no change was made in the stock ledgers or corporate books.

On June 26, 1989, A.C. signed a document entitled "DECLARATION OF GIFT," which conveyed his common stock in ABB Properties to B.B.  The document stated:

> For love and affection, the undersigned AMRATLAL C. BHAGAT, hereby transfers and conveys the following common capital stock of ABB PROPERTIES CORPORATION to and in favor of his son, BHARAT A. BHAGAT, [at a particular address in Winter Park, Florida]:
>
> (a)  53 shares of the class A (voting) common capital stock of ABB Properties Corporation.
>
> (b)  187 shares of the class B (non-voting common) capital stock of ABB Properties Corporation.

On the same date, A.C. signed a "STOCK POWER," in which he "s[old], assign[ed] and transfer[red]" to B.B. fifty-three shares of Class-A voting stock, and also appointed his attorney "to transfer the said stock on the books of the within named company with full power of substitution in the premises."  That same day A.C. signed a similar "STOCK POWER" for 187 shares of Class-B non-voting stock.  These documents do not indicate that the transfer was temporary or conditional.  Also on that date, B.B. signed an "OPTION TO PURCHASE STOCK," in which he granted A.C. "the option, exercisable exclusively by him, to purchase any or all" of the gifted shares at the price of $1 per share.

6

This instrument provided that the option "shall expire five years from the date hereof or upon the death of [A.C.], whichever shall first occur."

Around the time of this transaction, A.C. lived with B.B. in Florida. Purportedly, in accordance with traditions of Indian culture, A.C. frequently spoke about the family business and would tell B.B. "all of this is for you only." B.B. asserts that "in the Indian culture, it is customary for the father to give everything to the eldest son."

On August 24, 1989, an attorney for ABB Properties, William A. Walker II, wrote two letters that referenced the gift. Walker wrote one letter to A.C. referencing the documents granting the gift and instructing A.C. to retain those documents and the proper notation of the option on the stock certificates. The second letter was to a real estate loan officer at Southeast Bank in Florida, which stated in relevant part:

> Based upon certification received by us from Attorney James P. MacLean, III of Haddonfield, New Jersey, we advise that Bharat A. Bhagat held 48 shares of the voting common stock and 162 shares of the non-voting common stock, representing 24% and 20.25% of the outstanding and authorized shares, respectively.
>
> In a recent transaction which occurred in our office Mr. Bhagat became owner of additional shares as follows:
>
> 53 shares of voting common stock
> 187 shares of non-voting common stock

The result of the above is that, based upon the certification of Attorney James P. MacLean III and the transaction which occurred in our office, Mr. Bharat A. Bhagat became the owner and holder of the following shares of common capital stock in ABB Properties, Inc., a New Jersey Corporation.

101 shares of Class A (voting) common capital stock representing 50.5% of the total outstanding. 349 shares of Class B (non-voting) common capital stock representing 43.6% of the total outstanding.

Under the terms of the stock certificate, the shares are transferable on the books and records of the corporation, which we do not maintain, but execution of the appropriate stock powers and delivery of certificates representing the transfer of ownership and control to Bharat A. Bhagat have been completed, which two items constitute all incidence of ownership necessary to vest control in Bharat A. Bhagat.

In 1990, using the same set of forms as those used in the 1989 transaction, A.C. transferred 50 shares of Class-A voting stock and 288 shares of Class-B non-voting stock in ABB Properties to B.B. The parties did not use an attorney for this transaction but simply utilized the same forms that the attorneys had prepared the prior year, modified with the new dates and number of shares. According to B.B., the purpose of this transaction was for A.C. to convey to him, by gift, all of the remaining shares of which A.C. was the beneficial owner, making B.B. the "owner of ABB [Properties] stock."

8

Inadvertently, one share of ABB Properties remained in A.C.'s name.  According to A.C., the 1990 transaction was intended to be a "re-do" of the 1989 transaction, which he contends had never been effective.

In 1994, after A.C. purportedly transferred his entire stock in ABB Properties to B.B., A.C. and B.B. sued the Tailors to impose a constructive trust, to appoint a receiver, and for damages and an accounting regarding the operation of the Bordentown hotel and acquisition of a neighboring hotel by the Tailors.  A.C. and B.B. alleged that the Tailors mismanaged the Best Western hotel and used Easterner's funds to purchase a neighboring hotel in the name of Bordentown Hotels, Inc., a corporation wholly owned by the Tailors.

The verified complaint filed by A.C. and B.B., and certified by B.B., stated that B.B. owned 48 shares of voting stock, and A.C. owned 104 shares.  The complaint also related a series of corporate actions taken by A.C. and B.B. against Nagarki Tailor, A.C.'s son-in-law and B.B.'s brother-in-law, following their discovery of his application to obtain another Best Western franchise.  The actions undertaken by A.C. and B.B. removed Nagarki Tailor as President and General Manager of Easterner and installed A.C. as President and Treasurer of Easterner and B.B. as Assistant Secretary.  B.B. also reiterated the stock ownership distribution in the answer to the Tailors'

counterclaim, and in an affidavit executed in December 1994 in the _Tailor_ litigation.

Although A.C. had been installed as an officer of Easterner, since 1995, he spent most of his time living in his native India. During that time, B.B. ran ABB Properties, and A.C. received no salary or distributions from ABB Properties and filed no tax returns in the United States.

A.C.'s and B.B.'s stock ownership in ABB Properties was not at issue in the _Tailor_ litigation, which was eventually resolved by settlement and consent order in November 1999. Through the settlement the Tailors relinquished their shares of stock in ABB Properties; afterwards those shares were cancelled. As a result of the 1989 and 1990 transactions between A.C. and B.B. and the settlement of the _Tailor_ litigation, B.B. emerged as the sole owner of all shares of stock in ABB Properties, except for one share left in A.C.'s name.

In response to a motion for summary judgment in the current litigation, B.B. later certified that his representation of the stock in the _Tailor_ litigation accounted for the fact that the corporate books reflected A.C.'s name. B.B. insisted, however, he was the "beneficial owner." B.B. certified that "[t]his was an approach we followed generally from 1981-1989 when title remained in my name while beneficial ownership remained in my father's name." B.B. further certified that A.C. requested that

10

B.B. not reveal the gift in the Tailor litigation. B.B. explained in his certification that although the statements he made

> in the Tailor litigation may appear at odds with the gifting that occurred in 1989 and 1990 . . . my father and I had the understanding about distinguishing between legal title and beneficial ownership . . . [and that] I was the beneficial owner of the stock that had been gifted to me in 1989 and 1990 and I enjoyed all of the rights of the owner of the stock with my father's full knowledge and agreement.

At some point during the Tailor litigation, A.C. hand-wrote a letter to William Hyland, Jr., the attorney representing A.C. and B.B. in that litigation, stating: "It is my desire since 1989 to transfer my shares of ABB Properties Inc. to my son Bharat Amratlal Bhagat. Kindly do so at the earliest moment." The record does not reveal whether there were any further communications between A.C. and his attorney or whether any further action was taken. The record suggests that this transfer never occurred.

## II.

In addressing the cross motions for summary judgment, the motion judge held that the position taken by B.B. in the earlier litigation with the Tailors did not bar him from asserting that the stock in ABB Properties had been transferred to him by his father as a gift. The motion judge observed that the matter had

11

settled, no testimony had been taken from any parties, and the court had made no determination about any disputed issues in the litigation, including who owned what shares and the circumstances under which any party acquired any shares in any corporation.  Rather, a judge had simply signed and filed a consent order.

As to the central issue in the litigation between father and son, the motion judge found that the proofs concerning intent and delivery of the stock were overwhelming.  He cited the declarations of gift, concurrent stock powers, and an undated letter from counsel for ABB Properties confirming the transfer of the gift documents.[4]  Additionally, the judge cited a letter from A.C. to ABB Properties' attorney "unequivocally memorializing [A.C.'s] intent to transfer all his stock in ABB [Properties] to his son."  The judge also found that B.B. accepted the gift and B.B. retained the documents, thereby rendering both issues, acceptance and dominion, undisputed.

Applying the presumption in favor of a gift, the judge examined the evidence advanced by A.C. to rebut the presumption and "prove convincingly and without reasonable doubt as to the contemporaneous intent of [A.C.] to gift 100% of the shares of ABB [Properties] to [B.B.]."  Measured by this standard, the

---

[4] As the motion judge noted, while the parties did not dispute that the undated letter was not contemporaneous with the proposed gift, it in no way undermined the gift.

12

motion judge found that A.C. had failed to sustain his burden of proof, noting that "none of his proofs are antecedent or contemporaneous with the execution of the gift documents." Further, the motion judge determined that B.B.'s understanding or intent was immaterial to the gift analysis, and that A.C.'s "sworn certification[s] made more than 20 years after the time of the purported gift" were insufficient to rebut the presumption. The motion judge, therefore, granted B.B.'s motion for summary judgment and denied A.C.'s motion for the same relief.

The Appellate Division affirmed. The appellate court summarily rejected the preclusionary arguments advanced by A.C., including judicial estoppel, and adopted the reasoning of the motion judge. As to the stock transactions, the Appellate Division noted that in this state a transfer of stock by a parent to a child is presumed to be a gift. To overcome the presumption, the proof advanced must be "certain, definite, reliable and convincing, and leave no reasonable doubt as to the intention of the parties." Moreover, the evidence advanced to rebut the presumption must precede the transfer or be contemporaneous to the transfer or originate immediately after the transfer. After examining the evidence marshaled by A.C., the panel determined that A.C. offered no proof that was antecedent or contemporaneous to the transaction. The Appellate

13

Division agreed with the motion judge, finding B.B.'s acceptance of the stock undisputed.

The panel acknowledged A.C.'s contention that the transfer to B.B. was designed solely to secure financing for another hotel venture. Thus, according to A.C., the transfer was never intended to be permanent and was also conditioned on securing the financing for the hotel. In essence, A.C. contended the shares reverted to him when B.B. failed to obtain the financing to further the venture. The panel also acknowledged that these contentions "could potentially establish a genuine issue of material fact if not for the parental gift presumption" and the heightened standard of proof as to the intention of the parties. In the end, the Appellate Division determined that the evidence overwhelmingly established A.C.'s donative intent and that "no rational factfinder could find that A.C. overcame the presumption that a completed gift occurred by certain, definite, reliable and convincing proof, that leaves no reasonable doubt as to the intention of the parties at the time of the gifts." The Court granted A.C.'s petition for certification. 208 N.J. 382 (2011).

### III.

On appeal, A.C. argues that the Appellate Division departed from the summary judgment standard set forth in Brill v. Guardian Life Insurance Co. of America, 142 N.J. 520, 540

14

(1995), and imposed a higher standard of proof and quality of proof to rebut donative intent in the context of intra-family property transfers.  A.C. contends that the appellate panel erred in evaluating the summary judgment motion in accordance with the heightened standard of "certain, definite, reliable and convincing proof" and also declaring that acts or statements made by the parties regarding donative intent are limited to those that are antecedent, contemporaneous, or immediately following the transfer.  A.C. maintains that reliance on case law that predated the modern summary judgment standard led to an erroneous result.  A.C. argues that the appellate ruling "turns the summary judgment standard upside-down."

Rather, A.C. contends that the motion judge and the appellate panel should have limited their review of the motion papers to consideration of the competent evidential materials presented by the parties, identification of the existence of disputed material facts, and determination whether, viewing the motion record in the light most favorable to him as the non-moving party, the competent evidential materials permit a rational factfinder to resolve the disputed facts in his favor.

A.C. also argues that the Appellate Division ignored detailed sworn statements submitted by him in support of his motion for summary judgment--specifically, sworn statements made by him based on personal knowledge concerning the events of 1989

and 1990--and in opposition to his son's motion for summary judgment. In addition, A.C. contends that the appellate panel misinterpreted the case law requiring contemporaneous acts and statements of intent.

Finally, A.C. insists that statements made by B.B. in prior intra-family litigation are inconsistent with statements made in this litigation. He contends that judicial estoppel bars B.B. from adopting a different position about the ownership of the stock in ABB Properties after making contrary statements in litigation with the Tailors. A.C. argues that the disposition of the prior litigation by settlement rather than by trial is irrelevant.

B.B. responds that the Appellate Division applied the correct summary judgment standard. He emphasizes that the process of evaluation of the competent evidential materials includes reference to the evidential standard governing the claim. Only then can the court determine whether genuine issues of material fact require resolution by the factfinder.

B.B. also argues that case law outlining the nature and quality of the proofs needed to rebut the presumption of a gift is neither outdated nor misapplied. Finally, B.B. contends that none of his statements in the earlier intra-family litigation invoke the doctrine of judicial estoppel because no factfinder,

16

judge or jury, ever resolved the issue of stock ownership in that matter.

                              IV.

The threshold issue in this appeal is whether B.B. is barred by the doctrine of judicial estoppel to argue that the stock transferred by A.C. to him was a gift.  If the doctrine applies to statements made by B.B. about ownership of the ABB Properties stock in prior intra-family litigation, he would be barred from contending that A.C. gifted those shares to him and summary judgment could not be granted in favor of B.B. as a matter of law.

A party who advances a position in earlier litigation that is accepted and permits the party to prevail in that litigation is barred from advocating a contrary position in subsequent litigation to the prejudice of the adverse party.  Kimball Int'l, Inc. v. Northfield Metal Prods., 334 N.J. Super. 596, 606 (App. Div. 2000), certif. denied, 167 N.J. 88 (2001); Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 620 (App. Div. 1990), aff'd o.b., 124 N.J. 520 (1991); see also Ali v. Rutgers, 166 N.J. 280, 287-88 (2000) (explaining that retraction of waiver of issue not equivalent to litigating an issue successfully or otherwise).  At the heart of the doctrine is protection of the integrity of the judicial process.  Cummings v. Bahr, 295 N.J. Super. 374, 387 (App. Div. 1996).

Judicial estoppel is an extraordinary remedy. Kimball, supra, 334 N.J. Super. at 608. It should be invoked only to prevent a miscarriage of justice. Ibid.; see also Ryan Operations G.P. v. Santiam-MidWest Lumber Co., 81 F.3d 355, 365 (3d Cir. 1996). It is also a doctrine that has been harshly criticized. Douglas W. Henkin, Comment, Judicial Estoppel— Beating Shields Into Iron Swords and Back Again, 139 U. Pa. L. Rev. 1711, 1729-43 (1991). However, we have not hesitated to apply it when warranted. Thus, a casino employee facing revocation of his license due to a criminal conviction was barred from disavowing in the license revocation proceeding the factual basis of his guilty plea. State, Dep't of Law & Pub. Safety v. Gonzalez, 142 N.J. 618, 632 (1995). Similarly, a litigant who asserted a position and obtained summary judgment and dismissal of a party's claim for indemnification was barred from taking a different position on appeal. Richardson v. Union Carbide Indus. Gases Inc., 347 N.J. Super. 524, 530 (App. Div. 2002).

Thus, the doctrine is not invoked unless a court has accepted the previously advanced inconsistent position and the party advancing the inconsistent position prevails in the earlier litigation. Stated differently, the doctrine does not apply when the matter settles prior to judgment because no court

18

has accepted the position advanced in the earlier litigation. Kimball, supra, 334 N.J. Super. at 607.

The facts presented in this appeal do not warrant application of this remedy.  Clearly, B.B. has taken inconsistent positions regarding the ownership of the contested stock in the prior intra-family litigation against the Tailors and in this litigation with A.C.  The prior litigation, however, was settled by the parties, thereby obviating the need for a judge to accept or reject the inconsistent position advanced by B.B.  Indeed, it does not appear that stock ownership was an issue in the earlier litigation.  On the other hand, as discussed later in this opinion, B.B.'s statements in the Tailor litigation are admissions that may be introduced as substantive evidence by A.C. and used to impeach his credibility in the current father-son litigation.

V.

An appellate court reviews an order granting summary judgment in accordance with the same standard as the motion judge.  W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012); Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). Therefore, this Court must review the competent evidential materials submitted by the parties to identify whether there are genuine issues of material fact and, if not, whether the moving party is entitled to summary judgment as a matter of law.

19

Brill, supra, 142 N.J. at 540; R. 4:46-2(c). In conducting this review, the Court must keep in mind that "an issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." R. 4:46-2(c). The practical effect of this rule is that neither the motion court nor an appellate court can ignore the elements of the cause of action or the evidential standard governing the cause of action.

Brill v. Guardian Life Insurance Co. of America illustrates this proposition. Brill, supra, involved a negligence claim against a life insurance broker and his agency for failing to advise a prospective insured of the availability of immediate, temporary coverage upon completion of the application process. 142 N.J. at 523. The Court reviewed the common law recognizing the duty owed by an insurance broker to an insured, sorted through the relevant and irrelevant facts asserted by the parties, and held that an expert opinion based on a false assumption did not create a genuine issue of material fact. Id. at 542-43. Only after identifying the elements of the cause of action and the standard of proof governing that claim could the Court then determine that no reasonable jury could conclude that the broker's failure to advise the plaintiff of the availability

of immediate coverage upon submission of the application caused the lack of effective coverage at the time of the plaintiff's death. Id. at 542-45.

The need to identify the elements of the cause of action and the standard of proof in evaluating a motion for summary judgment is well-illustrated by defamation actions against a media defendant. In Durando v. Nutley Sun, 209 N.J. 235 (2012), the Securities and Exchange Commission filed a civil complaint against two men charging them with assorted violations of federal securities law. Id. at 240. A regional daily newspaper reported that the complaint had been filed, identified the men, and summarized the charges against them. Id. at 241. Nothing in the article stated or suggested that either man had been arrested. Ibid. A weekly local newspaper reprinted all but the last three paragraphs of the original article and wrote a new headline for the article, which stated that the men had been charged in a stock scheme. Id. at 242. The local newspaper also prepared a "teaser" for the front page of the weekly publication that expressly stated that the local men had been arrested. Ibid. The weekly publication retracted the front page "teaser" three weeks later. Id. at 243.

In reviewing an Appellate Division opinion affirming summary judgment in favor of the media defendant, the Court identified the elements a plaintiff must establish in a

21

defamation action against a media defendant that publishes an article touching on a matter of public interest. Id. at 248. The Court also identified the elements of the cause of action of false light, id. at 249, and examined the actual malice standard, id. at 249-52. It did so because the Court recognized that, to defeat the media defendant's motion for summary judgment, the plaintiffs had to establish that a reasonable jury could conclude by clear and convincing evidence that the media defendants acted with actual malice. Justice Albin wrote:

> To defeat defendants' motion for summary judgment in this case, plaintiffs must establish that a reasonable jury could conclude by "clear and convincing evidence" that [the publisher of the weekly] published the erroneous teaser with actual malice. "Although courts construe the evidence in the light most favorable to the non-moving party in a summary judgment motion, the 'clear and convincing' standard in [a] defamation action adds an additional weight to the plaintiffs' usual 'preponderance of the evidence' burden."

> [Id. at 253 (citations omitted).]

In short, the evaluation of every motion for summary judgment requires the court, trial or appellate, to review the motion record against not only the elements of the cause of action but also the evidential standard governing that cause of action. We, therefore, turn to an examination of the elements of a valid inter vivos gift and the nature and measure of the proof required to rebut the presumption of such a gift.

22

VI.

There are three elements of a valid and irrevocable gift. First, there must be actual or constructive delivery; that is, "the donor must perform some act constituting the actual or symbolic delivery of the subject matter of the gift." Pascale v. Pascale, 113 N.J. 20, 29 (1988). Second, there must be donative intent; that is, "the donor must possess the intent to give." Ibid. Third, there must be acceptance. Ibid. We have also recognized that the donor must absolutely and irrevocably relinquish "ownership and dominion over the subject matter of the gift, at least to the extent practicable or possible, considering the nature of the articles to be given." In re Dodge, 50 N.J. 192, 216 (1967); accord Sipko v. Koger, Inc., 214 N.J. 364, 376 (2013); Farris v. Farris Eng'g Corp., 7 N.J. 487, 500-01 (1951).

Actual delivery of the gifted property is necessary except where "'there can be no actual delivery' or where 'the situation is incompatible with the performance of such ceremony.'" Foster v. Reiss, 18 N.J. 41, 50 (1955) (quoting Cook v. Lum, 55 N.J.L. 373, 374 (Sup. Ct. 1893)). A gift of stock is such a situation because the ownership of stock is now often recorded simply in book form by the issuer or a broker. See N.J.S.A. 12A:8-301b. Therefore, "[i]n the absence of express provisions to the contrary, stock may be transferred by delivery of a separate

23

written transfer, without delivery of any certificate where it is not in possession of the transferee." Hill v. Warner, Berman & Spitz, P.A., 197 N.J. Super. 152, 162 (App. Div. 1984). In other words, the delivery of the stock certificate may be constructive, and the failure to record the transfer on the corporate books does not defeat the gift so long as the transfer is accompanied by words that express donative intent and the donor has divested himself completely of the property. Id. at 162-63.

The burden of proving an inter vivos gift is on the party who asserts the claim. Sadofski v. Williams, 60 N.J. 385, 395 n.3 (1972). Generally, the recipient must show by "clear, cogent and persuasive" evidence that the donor intended to make a gift. Farris, supra, 7 N.J. at 501. When, however, the transfer is from a parent to a child, the initial burden of proof on the party claiming a gift is slight. Metro. Life Ins. Co. v. Woolf, 136 N.J. Eq. 588, 592 (Ch. 1945), aff'd, 138 N.J. Eq. 450 (E. & A. 1946). In such cases a presumption arises that the transfer is a gift. Peppler v. Roffe, 122 N.J. Eq. 510, 515 (E. & A. 1937); First Nat'l Bank v. Keller, 122 N.J. Eq. 481, 483 (E. & A. 1937); Bankers Trust Co. v. Bank of Rockville Ctr. Trust Co., 114 N.J. Eq. 391 (E. & A. 1933); Prisco v. Prisco, 90 N.J. Eq. 289, 289 (E. & A. 1919); Herbert v. Alvord, 75 N.J. Eq. 428, 429 (Ch. 1909); Betts v. Francis, 30 N.J.L. 152, 155 (Sup.

24

Ct. 1862). The presumption does not apply if the parent is a dependent of the child. Peppler, supra, 122 N.J. Eq. at 515. See also Weisberg v. Koprowski, 17 N.J. 362, 372-73 (1955). The rationale for the presumption is that a child is considered a natural object of the bounty of the donor. Weisberg, supra, 17 N.J. at 373. See Restatement (Third) of Trusts § 9(2) (2001) (noting that resulting trust does not arise when transfer of property is made by one person but payment is made by another when recipient is spouse, dependent, or other natural object of person making payment).

This presumption, however, is rebuttable by evidence of a contrary intent. The earliest reported case that we have identified that addresses the nature of the proofs and the standard of proof to rebut the presumption is Peer v. Peer, 11 N.J. Eq. 432, 439 (Ch. 1857). In that case, the court held that a gift will be presumed when a parent advances funds to purchase real estate for a son and instructs that title shall be in the name of a child. Id. at 438-40. The presumption may be rebutted by evidence of "the same kind . . . deemed sufficient to create the presumption." Id. at 439. The court described the quality of the evidence that would be admissible to rebut the presumption as "convincing, and of such a character as to leave no reasonable doubt as to the intention of the party." Ibid.; accord Read v. Huff, 40 N.J. Eq. 229, 234 (E. & A. 1885).

25

In 1909, a court reiterated the Peer standard stating that the proofs required to rebut the presumption are "convincing and leave no reasonable doubt as to the intention of the party." Herbert, supra, 75 N.J. Eq. at 430. Ten years later, in Prisco, supra, a case in which a father purchased real property and took title in the name of his sixteen year old son, the Court of Errors and Appeals adopted the rule applied by the trial judge regarding the evidentiary burden of a party seeking to rebut the presumption of a gift. 90 N.J. Eq. at 289. The trial judge stated "the evidence must be convincing and leave no reasonable doubt." Ibid.; see also McGee v. McGee, 81 N.J. Eq. 190, 194 (E. & A. 1913) (instructing that proof offered to rebut presumption of gift "must be certain, definite, reliable and convincing, leaving no reasonable doubt of the intention of the parties").

In addition, the proofs advanced to rebut the presumption of a gift "must be of facts antecedent to or contemporaneous with the purchase, or so immediately afterwards as to form a part of the res gestae." Herbert, supra, 75 N.J. Eq. at 429-30; accord Prisco, supra, 90 N.J. Eq. at 289; Read, supra, 40 N.J. Eq. at 234; Peer, supra, 11 N.J. Eq. at 439.

In Herbert, supra, the court excepted from the antecedent or contemporaneous requirement statements or acts of the party to be charged with the gift. 75 N.J. Eq. at 429-30.

26

Furthermore, in Weisberg, supra, this Court followed the rule announced in Killeen v. Killeen, 141 N.J. Eq. 312, 315 (E. & A. 1948) and Yetman v. Hedgeman, 82 N.J. Eq. 221, 223 (Ch. 1913) that "the subsequent conduct of the parties may be given in evidence to corroborate the inference drawn from prior and contemporaneous circumstances." 17 N.J. at 374; see also Bertolino v. Damario, 107 N.J. Eq. 201, 202 (E. & A. 1930) (explaining that gift presumption may be rebutted by later admissions of parties). Notably, in Weisberg, supra, this Court did not preclude evidence of conduct subsequent to the son's purchase of the house in which his mother lived to rebut the presumption of a gift. 17 N.J. at 374-76.

Commentary has criticized the gift presumption between parent and child contending the presumption is founded on an undue emphasis on certain relationships. 5 New Jersey Practice, Wills and Administration § 4 n.1 (Alfred C. Clapp and Dorothy G. Black) (3d ed. 1984). In Weisberg, supra, this Court acknowledged the criticism of the rule presuming a gift based "on considerations of the closeness of the relationship or the extent of natural affection, []or by reason of any legal obligation to furnish support." 17 N.J. at 372. The Court noted that the relationship between the son, who had purchased the house in which his mother lived, and his mother "was such that, but for other evidence overcoming the inference, the

27

probability might well be inferred that [the son] did intend a gift of the properties to [his mother]." Id. at 373. Yet, the son marshaled substantial proofs not only antecedent to and contemporaneous with the purchase but also conduct subsequent to the purchase until the son's death to defeat any presumption of a gift. Id. at 374-76.

Other commentators criticize use of any standard of proof other than the preponderance of the evidence. 3 Austin Wakeman Scott, The Law of Trusts, § 458 (1939). In his treatise, Professor Scott opines that

> [n]o good reason, however, has ever been suggested as to why the preponderance of the evidence should not be sufficient to establish a trust, as it is sufficient to establish other facts in civil cases. There is perhaps, sufficient reason for requiring more than a preponderance of evidence to establish an express oral trust of land in states in which the Statute of Frauds is not in force. There is no reason for making such a requirement generally in the case of . . . resulting trusts or constructive trusts.
>
> [Ibid.]

The Restatement also calls for use of the preponderance of the evidence standard of proof. Restatement, supra, § 9, cmt. f(1). The Reporter notes, however, that case law on this issue is both conflicting and unclear. The Reporter relates that the rationale for a clear and convincing standard of proof in order to question beneficial ownership is the view "that there should

28

be a strong presumption in favor of one whose title is indicated without qualification in a written instrument . . . and that there is a danger of inviting perjured testimony in cases of this type." Id. at Reporter's Notes § 9, cmt. f.

As stated in numerous decisions dating to the mid-nineteenth century, the standard of proof seems to create a standard containing elements of the clear and convincing standard and the beyond a reasonable doubt standard. Responding to an argument that this Court in Weisberg also modified the standard of proof to rebut a presumption of a gift from no reasonable doubt to clear and convincing, the Appellate Division in Turro v. Turro, 38 N.J. Super. 535, 543 (App. Div. 1956) observed that Weisberg never addressed the standard of proof at all. Nevertheless, the appellate panel referred to seventeen cases from 1885 to 1951 that had described the burden of proof as requiring clear, reliable, and convincing proof leaving no reasonable doubt of the intention of the parties. Turro, supra, 38 N.J. Super. at 542. The panel recognized, however, that this description seemed to contain elements of the clear and convincing and beyond a reasonable doubt standards of proof and that some commentators had urged elimination of this hybrid standard because such a standard has the effect of giving undue weight to the presumption. Id. at 542-43. The panel noted that it was not its function to "overrule[] a proposition so

29

obviously approved by the highest court of the State." Id. at 544.

Notwithstanding the criticism of the presumption itself and the use of an enhanced standard of proof to rebut the presumption that a transfer of property, including stock in a family business, from a parent to a child is a gift, we can identify no reason to depart from our use of an enhanced standard of proof which has served well for more than 150 years. We discern, however, the need to clarify that standard and the proofs that may be admitted to meet it.

Although some of the earliest cases describe the standard of proof as "convincing and leav[ing] no reasonable doubt," Prisco, supra, 90 N.J. Eq. at 289; Herbert, supra, 75 N.J. Eq. at 430, later cases added additional adjectives, such as "certain," "definite," "reliable," and "convincing." McGee, supra, 81 N.J. Eq. at 194. As noted in Turro, supra, this description has elements of both the clear and convincing and beyond a reasonable doubt standards. 38 N.J. Super. at 542-43. Such a hybrid standard is an anomaly and given the criticism, not only of the very existence of the gift presumption in circumstances as presented in this case but also the use of any standard of proof other than preponderance of the evidence in these circumstances, we can identify no purpose in recognizing either a hybrid clear and convincing/no reasonable doubt

30

standard or a no reasonable doubt standard.  Rather, our examination of the cases suggests that the standard has been understood as, and should be, clear and convincing.  We view the other language used in the cases as simply an attempt to describe the quality of evidence, e.g., clear, cogent, certain, and definite, that will satisfy the clear and convincing standard of proof.

This interpretation is reflected in a leading treatise on equity jurisprudence.  As of 1941, this treatise stated, "[I]t is said that the presumption of a gift or advancement can be rebutted only by proof that is clear, convincing and satisfactory."  4 John Norton Pomeroy, Equity Jurisprudence § 1041 (5th ed. 1941).  Numerous cases are cited to support this proposition, including several cases from New Jersey which employ the "reasonable doubt" language.  See id. at 86-87 n.10.

Indeed, the Model Jury Charge on the clear and convincing evidence standard uses similar verbiage to describe the quality of the evidence that will meet this standard.  Model Jury Charge 1.19 provides in relevant part:

> Clear and convincing evidence is evidence that produces in your minds a firm belief or conviction that the allegations sought to be proved by the evidence are true.  It is evidence so clear, direct, weighty in terms of quality, and convincing as to cause you to come to a clear conviction of the truth of the precise facts in issue.

31

> The clear and convincing standard of proof requires that the result shall not be reached by a mere balancing of doubts or probabilities, but rather by clear evidence which causes you to be convinced that the allegations sought to be proved are true.

Moreover, we can discern no good reason why a father seeking to rebut a presumption of a gift of stock to an adult son should be required to meet an enhanced clear and convincing standard that requires no reasonable doubt, particularly when the no reasonable doubt standard applies in no other civil setting in this state.  Furthermore, the State is required only to meet the clear and convincing standard to terminate parental rights, Santosky v. Kramer, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 611-12 (1986); to involuntarily commit a person to a psychiatric facility, Addinton v. Texas, 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979); or to commit a person pursuant to the Sexually Violent Predator Act, In re Commitment of W.Z., 173 N.J. 109 (2002).  The clear and convincing standard of proof also governs an action to withhold life sustaining treatment from a person in a persistent vegetative state, Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 284, 110 S. Ct. 2841, 2854, 111 L. Ed. 2d 224, 245-46 (1990); or from an incompetent nursing home patient, In re Conroy, 98 N.J. 321, 382 (1985); in disciplinary proceedings against an attorney or a

doctor, In re Racmiel, 90 N.J. 646, 661 (1982); In re Polk License Revocation, 90 N.J. 550, 563 (1982); and to prove fraud, Fox v. Mercedes-Benz Credit Corp., 281 N.J. Super. 476, 484 (App. Div. 1995). This list is hardly exhaustive but illustrates the anomaly of applying a higher standard than clear and convincing evidence to rebut a presumption of a gift where a higher standard is not applied in circumstances affecting a person's life, liberty, ability to pursue a profession, or integrity.

We, therefore, hold that a person who has transferred property to another, which raises a presumption that the transferred property was a gift, must meet the clear and convincing evidence standard of proof to rebut the presumption. We also hold that the person seeking to rebut the presumption is limited to evidence antecedent to, contemporaneous with, or immediately following the transfer. In addition, a party seeking to rebut the presumption may also adduce proof of statements by the parties concerning the purpose and effect of the transfer.

## VII.

Applying these principles to the facts revealed in the summary judgment record, and all reasonable inferences from those facts drawn in favor of A.C., we conclude that B.B.'s motion for summary judgment should have been denied. To be

sure, the 1989 and 1990 transfers triggered the presumption that A.C. intended to gift his stock in the family business to his son. Accordingly, A.C. was required to adduce evidence to defeat a summary judgment motion that raised a genuine issue of material fact regarding one, some, or all of the elements of an inter vivos gift and those proofs had to rise to the quality required by the clear and convincing standard of proof.

The motion court and the appellate panel properly refused to consider some of the evidence offered by A.C. His proffer of statements by him years after the 1989 and 1990 transfers that B.B. was simply holding the shares to facilitate the conduct of affairs of the business while he was in India, or to facilitate financing of a business venture, was inadmissible. Those statements are neither antecedent to, contemporaneous with, or immediately following the transaction and thus fail to provide reliable evidence of the intent of the stock transfers.

On the other hand, the motion court and the appellate panel declined to consider various statements made by B.B. in the course of the conduct of the family business that contradict the position that A.C. transferred the entirety of his ABB Properties stock to his son. For example, in 1994, B.B. certified the facts contained in the Verified Complaint filed against his sister and brother-in-law. He certified that A.C. owned approximately 50% of the voting stock in the business. In

an affidavit submitted in the same matter, he made a similar statement. The complaint in the prior litigation also relates a series of corporate actions taken by A.C. and B.B. in their capacity as stockholders and corporate officers of ABB Properties that removed B.B.'s brother-in-law from his corporate positions and management responsibilities at Easterner and installed themselves as officers of that corporation. B.B. certified that these facts were true. These prior inconsistent statements made in the prior intra-family litigation do not judicially estop his current defense to A.C.'s complaint that A.C. transferred the stock to him and that the transfer was intended as a gift from father to son, but these statements may be considered admissions of a party and evidence that may impeach B.B.'s credibility.

In addition, B.B. also filed two certifications in this matter in which he describes A.C. as the beneficial owner of the ABB Properties stock and his understanding of that term. Drawing all inferences in favor of B.B. created by this discourse, a question of fact arises whether A.C. and B.B. contemplated an unconditional transfer of the stock or simply a temporary transfer to facilitate other business ventures or to ease the ability to conduct the day-to-day affairs of the business while A.C. was in India. B.B. also relies on cultural traditions to support his position that the transfer of stock

35

was a natural and ordinary event in the culture of this family. While his statement may be true, the record is barren of any independent support for this proposition that would permit a court to take judicial notice of this fact.  N.J.R.E. 201(b).

The standard of proof to rebut the presumption of a gift in this case is exacting.  When that standard governs the evaluation of evidence produced by both parties in support of and in opposition to cross-motions for summary judgment, we can expect many such motions to be granted.  Here, however, several statements by B.B. raise genuine issues of fact about whether the 1989-90 stock transfers were an unqualified gift from father to son or a mere matter of convenience to further a family business.  The inconsistent statements in the prior intra-family litigation also require an assessment of B.B.'s credibility beyond that accomplished by simply examining affidavits, letters, notes, and other documents.

This is a close case.  Nevertheless, B.B.'s statements regarding the ownership of ABB Properties stock raises sufficient factual issues to preclude summary judgment and to require a trial.

VIII.

The judgment of the Appellate Division is reversed and the matter is remanded for further proceedings consistent with this opinion.

36

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, PATTERSON; and JUDGE RODRÍGUEZ (temporarily assigned) join in JUDGE CUFF's opinion.

SUPREME COURT OF NEW JERSEY

NO. __A-31__                    SEPTEMBER TERM 2011

ON CERTIFICATION TO ____Appellate Division, Superior Court____


AMRATLAL C. BHAGAT,
Individually and as
Shareholder of ABB PROPERTIES
CORPORATION, A New Jersey
Corporation and as a
Shareholder of EASTERNER
MOTOR INN, INC., a New Jersey
Corporation,

      Plaintiff-Appellant,

         v.

BHARAT A. BHAGAT and CRANBURY
HOTELS, LLC, a New Jersey
Limited Liability Company,

      Defendants-Respondents.



DECIDED _____January 30, 2014_____
           ____Chief Justice Rabner_____ PRESIDING
OPINION BY ____Judge Cuff_____
CONCURRING/DISSENTING OPINIONS BY _____
DISSENTING OPINION BY _____


| CHECKLIST | REVERSE AND REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |

1