**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3175-23

SISTERS OF CHARITY OF
SAINT ELIZABETH,

     Plaintiff-Respondent,

v.

TOWNSHIP OF MORRIS and
THE TOWNSHIP COMMITTEE
OF THE TOWNSHIP OF MORRIS,
THE BOROUGH OF FLORHAM
PARK, THE VILLA AT FLORHAM
PARK, INC., and MORRIS COUNTY
GOLF CLUB, INC.,

     Defendants-Respondents.

_____

TOWNSHIP OF MORRIS and
THE TOWNSHIP COMMITTEE
OF THE TOWNSHIP OF MORRIS,

     Third-Party Plaintiffs,

v.

THE BOROUGH OF FLORHAM
PARK,

Third-Party Defendant.

_____

FLORHAM PARK PROPERTY, LLC,
as successor in interest to the VILLA
AT FLORHAM PARK, INC.,

    Appellant.

_____

Argued November 17, 2025 – Decided March 25, 2026

Before Judges Natali, Walcott-Henderson, and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-0975-20.

Steven W. Griegel argued the cause for appellant (Roselli Griegel Lozier, PC, attorneys; Mark Roselli and Steven W. Griegel, on the briefs).

Thomas F. Carroll, III, argued the cause for respondent Sisters of Charity of Saint Elizabeth (Hill Wallack LLP, attorneys; Aileen M. Brennan and Thomas F. Carroll, III, on the brief).

Joseph J. Bell, IV, argued the cause for respondent Borough of Florham Park (Bell, Shivas & Bell, PC, attorneys; Joseph J. Bell, IV, of counsel and on the brief).

John M. Mills, III, argued the cause for respondent Township of Morris (Mills & Mills PC, attorneys; John M. Mills, III, on the brief).

Calli Law LLC, attorneys for respondent Morris County Golf Club (Simone Calli and Lawrence Calli, on the brief).

PER CURIAM

Florham Park Property, LLC (FPP), successor in interest to defendant the Villa at Florham Park (the Villa), appeals from certain October 13, 2023 orders which granted summary judgment in favor of the Borough of Florham Park (Florham Park), the Sisters of Charity of Saint Elizabeth (the Sisters), and Morris Township (Morris), and dismissed all of FPP's claims. FPP also appeals from a May 2, 2024 consent order, which marked settled and dismissed the matter based upon a settlement agreement entered into by plaintiffs, the Sisters, and defendants, Morris, Florham Park, and Morris County Golf Club (the Golf Club). We affirm.

I.

The Sisters own a parcel of land located in both Morris and Florham Park which contains their academic campus, Motherhouse, and their privately-owned sewage pump station and force main. The Sisters sought to sell a portion of their campus for development, which included affordable housing. FPP owns an adjacent property which is served by the pump station and force main. FPP objected to the sale and alleged the proposed development will utilize sewage

3

A-3175-23

capacity such that FPP will be unable to expand or develop their property in the future.

The Sisters initiated the litigation below against Morris to settle ownership of the pump station and force main, and to obtain sewer service for their new development. The matter proceeded to this court, resulting in an unpublished decision which directed a remand regarding ownership of the facilities, but confirmed that Morris would provide sewer service to the new development. Sisters of Charity of Saint Elizabeth v. Twp. of Morris and the Twp. Comm. of the Twp. of Morris, No. A-226-20 (App. Div. June 24, 2021) (slip op. at 24).

On remand, the Sisters named the Villa and Morris County Golf Club (the Golf Club) as interested parties because they shared use of the pump station and force main. The Villa, and later FPP by substitution after it purchased the property in the spring of 2023, asserted counterclaims and crossclaims seeking to preserve its ability to expand its use of the pump station and force main, and these claims were dismissed on summary judgment after the trial court found that they were not yet ripe. After the Villa's and FPP's counterclaims were dismissed on summary judgment, and the Sisters' claims against the Villa and FPP were also dismissed, the Sisters, Morris, Florham Park, and the Golf Club

4

A-3175-23

entered into a settlement agreement allowing the development to proceed, which the court formalized in a consent order in May 2024.

Background and the 1981 Agreement

Since 1860, the Sisters have owned approximately 150 acres of property including roughly 50 acres in Morris and 100 in Florham Park. The property includes a Motherhouse, the Academy of Saint Elizabeth, and Saint Elizabeth University. Until 2016, the Sisters also owned an adjacent parcel in Florham Park containing a skilled nursing facility, which was sold to the Villa and later to FPP. The Sisters' presence predated municipal utilities and therefore these properties processed their own sewage, initially by way of a private sewage treatment plant.

In 1981, the Sisters sought to connect their properties, including both the 150 acres in Morris and Florham Park as well as the skilled nursing facility, to Morris' municipal sewer system. On July 28, 1981, the Sisters, Morris, Florham Park, and the Florham Park Sewerage Authority entered into a written agreement (the 1981 Agreement), permitting the Sisters to connect these properties to the Morris system after constructing a pump station and force main on their campus.

The 1981 Agreement expressly provided that the Sisters' sewage could be connected to the Morris system while traveling over part of the Florham Park system. The Sisters constructed and undertook maintenance of their pump station and force main. The 1981 Agreement provided that the total maximum average flow from all of the Sisters' properties, including the skilled nursing facility now owned by FPP, was to be 95,000 gallons per day. It required that the Sisters' pump station and force main be made available to other users whose properties were "practicably within reach" of these facilities.

In a 1997 agreement, the Sisters and Morris permitted the Golf Club to connect to the pump station and force main, consistent with the 1981 Agreement. As a result, the Sisters' pump station and force main presently serve the Sisters' campus, as well as the Golf Club and FPP's skilled nursing facility. The pump station and force main deliver this sewage into the Morris system for treatment at Morris' wastewater plant.

The 2016 Sale From the Sisters to the Villa

In 2016, the Sisters sold the skilled nursing facility to the Villa. The sale agreement included:

> (m) the right to convey sanitary sewer and waste water flow from the [Villa] Land and Facility, as now exists to the public sewage disposal system owned and maintained by [Morris], through the intervening

6

sewage disposal and related improvements owned and maintained by the [Sisters] to the extent such right is held by the [Sisters] pursuant to a sanitary sewer agreement . . . and all other rights of [the Sisters] transferrable pursuant to the Sanitary Sewer Agreement, which shall be executed at the Closing by all of the Parties and all other parties to the Sanitary Sewer Agreement as indicated therein. [The Sisters] shall consent to [the Villa's] increased usage, provided, however, that in the event the Facility is expanded, the cost to expand or upgrade the private sewer improvements, if necessary, shall be paid by the party seeking such increase in sewer flow and the party generating the increased flow shall be responsible for any increased percentage of the maintenance costs as in proportion to the increased percentage of overall flow generated by said party. In no case shall any rights referenced under this paragraph be deemed to include rights which [the Villa] may also require to be issued from [Morris], [Florham Park], or the Florham Park Sewerage Authority, it being the intention of the parties hereto that the rights referenced under this paragraph relate only to the [Sisters'] rights in the private sewer improvements which are now owned by [the Sisters].

A comprehensive Sanitary Sewer Agreement between the Sisters and the Villa, annexed to the sale agreement, provided that the Sisters granted the Villa an easement necessary to use the sewer system, and provided additional terms about the parties' arrangement. Morris, Florham Park, and the Golf Club were

not parties to the Sanitary Sewer Agreement.[1]  The 2016 Sanitary Sewer Agreement did not establish a specific gallonage limitation for the Villa, but nonetheless provided for the possibility of expansion of the Villa's then-existing sewer capacity:

> 22.  The [Sisters] agree that the [Sisters] shall not prevent [the Villa] from seeking to expand the conveyance capacity of the portion of the [Sisters'] System that conveys or pumps flow from [the Villa property] so as to convey additional flow from [the Villa property] (an "Expansion"), and the [Sisters] agree to reasonably assist in that regard at no cost to the [Sisters], provided that the following conditions are met:

This section then included several prerequisites to any attempts to expand the Villa's sewage capacity:

> a. The engineering plans for the modification of the facility to address the Expansion shall be prepared by New Jersey licensed professionals in accordance with applicable state regulations and statutes and shall be reviewed and approved by [the Sisters], such approval not to be unreasonably withheld, conditioned, or delayed. [The Villa] will provide certified copies of the as-built plan, upon completion of the work.  All work and added equipment will be warranted by [the Villa] for one year;

---

[1]  We note that Morris was originally listed as a party to this agreement but did not execute it.

b. [The Villa] shall obtain all required governmental and regulatory approvals for the modification of [the Sisters'] System as well as approvals for the conveyance of additional sanitary sewer flow through [Morris'] system and into the ultimate treatment facility including, but not limited to approval from [Morris], with copies of same provided to [the Sisters]. The parties expressly acknowledge that [the Sisters] cannot approve the treatment of additional sewer flow [from the Villa] by the [Morris] sewer treatment plant, the allocation of capacity for same, or the right to convey additional flow within the [Morris] owned sewer system and that any agreement by [the Sisters] as to an Expansion is exclusive of such additional authority or approvals that must be obtained by [the Villa].

c. [The Villa] shall cause the modification of the sanitary sewer system to be completed in a proper, workman like manner so as to minimize disruption to any and all users of [the Sisters'] system and on reasonable advance notice to all parties; and

d. [The Villa] shall be responsible for the payment of all costs of the design, planning, approval, and construction of all improvements to affect the modification of this system for the Expansion.

As relevant here, the Sanitary Sewer Agreement further provided:

28. The parties hereto shall have equal rights and responsibilities regarding any unused by reserved sewer capacity associated with the pump station and, as indicated above, shall share in the cost of maintaining same based on a percentage of sewer flow.

The Current Property Sale and This Litigation

9

After owning the property since 2016, the Villa entered a contract to sell its interests to FPP in 2022, and the sale occurred in 2023. As noted, the Sisters plan to sell approximately twenty-two acres of their property located in both Morris and Florham Park for residential development, consistent with New Jersey's affordable housing laws. The Sisters intend to increase the capacity of the pump station from 95,000 gallons per day to 142,550 gallons per day to accommodate the additional flow from the new development.

In conjunction with the sale of the twenty-two acres, the Sisters, Morris, and Florham Park reached a tentative agreement whereby Morris would accept the sewage flow for treatment and Florham Park would operate the pump station and force main. FPP objected to these changes citing the 2016 documents and sought approximately 30,000 gallons per day of sewage capacity in the hope of expanding its facility. FPP alleged that the pump station had a then-existing excess capacity of 31,500 gallons per day and that they were entitled to half that amount, or 15,570 gallons per day in addition to its then existing need, pursuant to Paragraph 28 of the Sanitary Sewer Agreement.

The Sisters commissioned a report by Robert Gill from Menlo Engineering Associates, which indicated that the FPP property, as then-existing, required 8,100 gallons of sewer capacity per day. The report further provided

that, even if FPP expanded to its full potential under its then-existing license, the "maximum bed count would be 126 [a]ssisted [l]iving beds," requiring a flow rate of 12,600 gallons per day. Morris agreed to continue to provide sewer service sufficient to serve the existing operation at FPP as it has done in the past.

The Settlement Agreement

A settlement agreement was executed by the Sisters, Morris, Florham Park, and the Golf Club on April 25, 2024, which provided that Morris would accept the sewage produced by the new development, together with the sewage flows "currently connected" to the pump station. It further provided that Florham Park would accept ownership and operation of the pump station and force main after upgrades made by the Sisters. The settlement agreement expressly provided that FPP "shall maintain whatever rights it may have, pursuant to contract or otherwise . . . ."

Specifically, the settlement agreement stated that the "95,000 gallons per day . . . set forth in Paragraph 10 of the 1981 Agreement shall be increased to an average daily flow of 142,550 GPD . . . ." The 142,550 gallons per day are allocated as follows: 123,950 gallons per day for the Sisters' property, including the new development; 8,100 gallons per day for FPP's property; and 10,500 gallons per day for the Golf Club property.

11

The Sisters, Morris, and Florham Park moved for summary judgment and sought dismissal of all claims raised by the Villa and FPP. In its oral opinion, the court concluded that any claims against Morris and Florham Park were not ripe for adjudication, and any decision by the court would accordingly constitute an improper advisory opinion. The court determined that Morris and Florham Park had "done nothing wrong" and would continue to provide sewer service to FPP's facility as required. The court concluded that "[n]othing has happened which takes away from FPP anything that it [is] entitled to contractually." The court noted FPP's counsel "acknowledge[d] . . . there [is] no showing [FPP] made an application . . . consistent with the provisions of [Paragraph 22] to [show] they [have] been denied anything."

With respect to Paragraph 28 of the 2016 Sanitary Sewer Agreement, the court further found that any claim regarding a breach of that provision was "premature . . . [and] [t]he plaintiff's rights have to be violated and capacity not given . . . before it [is] ripe for adjudication." Accordingly, the court entered the October 13, 2023 orders which granted summary judgment in favor of Florham Park, the Sisters, and Morris, and dismissed all of FPP's claims. Thereafter, pursuant to the April 25, 2024 settlement agreement, the court entered the May 2024 consent order and the matter was dismissed.

This appeal followed in which FPP argues the court erred by (1) granting summary judgment and dismissing the counterclaims against the Sisters; (2) dismissing its tortious interference crossclaims against Morris and Florham Park; and (3) entering the consent order. We are not persuaded by any of FPP's arguments. We find no error in the court's dismissal of FPP's counterclaims and entering summary judgment in favor of the Sisters because FPP's claims were not ripe for adjudication. We also find no error in the court's dismissal of FPP's crossclaims for tortious interference against Morris and Florham Park because at the time the court granted summary judgment, there had been no action by Morris or Florham Park remotely adverse to FPP's position. We similarly find the court did not err in entering the consent order without FPP's involvement as FPP had been dismissed from this litigation at the time of the May 2024 consent order.

## II.

An appellate court reviews a grant of summary judgment de novo, using the same standard that governed the trial court's decision. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). Summary judgment will be granted when "the competent evidential materials submitted by the parties," viewed in the light most favorable to the non-moving party, show that there are no "'genuine issues of material fact

and . . . the moving party is entitled to summary judgment as a matter of law.'" Grande v. Saint Clare's Health Sys., 230 N.J. 1, 23-24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)); accord R. 4:46-2(c).

## A.

We first address FPP's contentions that the court erred in dismissing on summary judgment its counterclaims against the Sisters. FPP argues the court failed to recognize that the Sisters breached the 2016 Sanitary Sewer Agreement due to the Sisters' increase of their allowable sewer flow and total capacity of the system.

In our jurisprudence, "it is well settled that we [do] not render advisory opinions or function in the abstract." Indep. Realty Co. v. Twp. of North Bergen, 376 N.J. Super. 295, 301 (App. Div. 2005) (citing Crescent Park Tenants Ass'n v. Realty Equities Corp., 58 N.J. 98, 107 (1971)). Rather, litigation is restricted "to those situations where the litigant's concern with the subject matter evidenced a sufficient stake and real adverseness." Ibid. (internal citation and quotation marks omitted). The ripeness doctrine prevents "premature adjudication" or "entangl[ement] . . . in abstract disagreements." House of Fire Christian Church v. Zoning Bd. of Adjustment of City of Clifton, 379 N.J. Super. 526, 547 (App. Div. 2005) (quoting Murphy v. New Milford Zoning Comm'n,

402 F.3d 342, 347 (2d Cir. 2005)).  Claims are ripe for adjudication "only when there is an actual controversy, meaning that the facts present 'concrete contested issues conclusively affecting' the parties' adverse interests."  Matter of Firemen's Ass'n Oblig., 230 N.J. 258, 275 (2017) (citing N.J. Turnpike Auth. v. Parsons, 3 N.J. 235, 241 (1949)).

Further, to prevail on a claim of breach of contract:

> [o]ur law imposes on a plaintiff the burden to prove four elements: first, that "the parties entered into a contract containing certain terms"; second, that "plaintiffs did what the contract required them to do"; third, that "defendants did not do what the contract required them to do," defined as a "breach of the contract"; and fourth, that "defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs."
>
> [Goldfarb v. Solimine, 245 N.J. 326, 338 (2021) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016)).]

There was no breach of Paragraph 28 of the Sanitary Sewer Agreement at the time the court granted summary judgment.  Even if we were to interpret the language "equal rights and responsibilities regarding any unused by reserved sewer capacity" to mean, as FPP argues, that is was entitled to half the unused sewer capacity, FPP has not yet been denied such capacity at the time of the order, or at present based on the record before us.  Indeed, the record is devoid

15

of evidence reflecting a justiciable controversy on the issue. FPP has not been denied any capacity in response to any request tied to a concrete development plan. We accordingly are convinced the court properly granted summary judgment as FPP's claims are ultimately not ripe for adjudication as its interest has not been adversely impacted pursuant to the Sanitary Sewer Agreement or otherwise. See Indep. Realty Co., 376 N.J. Super. at 301; see also Matter of Firemen's Ass'n Oblig., 230 N.J. at 275.

Stated differently, no breach with respect to FPP's right to seek expansion was present at the time of the order because FPP had not yet sought to exercise its right to expand under Paragraph 22. The evidence on summary judgment indicated that FPP provided no engineering plans and did not submit any governmental and regulatory applications as mandated under Paragraph 22. In fact, counsel for FPP admitted at the motion hearing that "some of this may be premature . . . until [the Sisters] take action that adversely impacts the rights of . . . FPP", and that FPP's damages were "unknown." FPP of course remains free to expand consistent with the Sanitary Sewer Agreement and all justiciable disputes can be addressed by the parties, and the court if necessary, when and if they arise.

A-3175-23

For similar reasons, we are satisfied the court properly granted summary judgment with respect to FPP's counterclaims for restitution, indemnity, contribution, and apportionment against the Sisters because FPP incurred no losses.

We also reject FPP's argument that summary judgment was inappropriate because the settlement agreement breached the Sanitary Sewer Agreement by purportedly giving all excess sewer capacity to plaintiff. First, we note that the settlement agreement arose only after summary judgment was granted and second, as noted, FPP retains its rights in law to claim any additional sewer capacity that it is purportedly owed pursuant to the Sanitary Sewer Agreement. If FPP requests additional capacity and is improperly denied contrary to the relevant agreements, at that time the issue can be properly addressed by the court where a factual background and a concrete, as opposed to a hypothetical, dispute can be resolved.

Finally, we reject FPP's contention that the court erred in finding sections a. through d. of Paragraph 22 were conditions precedent to its right to seek expansion. The court never expressly made this finding and instead merely found that FPP had taken no action whatsoever to seek any expansion of its sewer use, a fact that remains undisputed.

17

B.

Next, we address FPP's argument the court erred in dismissing its crossclaims for tortious interference against Morris and Florham Park. FPP asserts that Morris and Florham Park "intentionally interfered with [FPP's] known rights" by negotiating with the Sisters to resolve this matter. We reject FPP's claims of error.

"The tort of interference with a business relation or contract contains four elements: (1) a protected interest; (2) malice—that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." DiMaria Const., Inc. v. Interarch, 351 N.J. Super. 558, 567 (App. Div. 2001), aff'd o.b., 172 N.J. 182 (2002). Here, the court properly found that the claim for tortious interference was not yet ripe. At the time the court entered the order granting summary judgment, there had been no action by Morris or Florham Park which was even remotely adverse to FPP's position. Indeed, Morris and Florham Park continued to provide sewer service to FPP's property consistent with their municipal obligations and were willing to consider requests for expanded service. Based on the motion record, the municipalities negotiated in good faith with the Sisters and the Villa, but did not reach any final agreement

18

affecting the Villa or FPP.  Thus, FPP suffered no damages to establish a claim for tortious interference, a point counsel for FPP apparently conceded at oral argument when he stated "until [Morris and Florham Park] enter into a formal settlement agreement . . . which impacts the existing rights of FPP, there may not be any [tortious] interference."  We are satisfied the court appropriately found any claims for tortious interference to be not yet ripe.

C.

Finally, we turn to FPP's contention that the court erred in entering the consent order without its involvement because, even after its claims were dismissed on summary judgment, it remained a party with a right to participate in that process.  FPP further argues it remained a party after the dismissal of its claims on summary judgment because the Villa was named as an interested party defendant in the Sisters' amended complaint.

As noted, the Sisters named the Villa in their amended complaint "as interested party defendants herein so that they will have an opportunity to provide this [c]ourt with input as to the requested relief, and so that they will be bound by the [o]rders to be entered in this matter" and FPP was substituted into

that role. The Villa's counterclaims, and thus FPP's claims, were dismissed on summary judgment, but these orders did not expressly dismiss FPP from this litigation. A subsequent order did, however, state that FPP had been dismissed from this matter. The consent order and settlement agreement were subsequently entered without FPP's involvement.[2]

Rule 4:42-1(b) provides, in relevant part:

> . . . no judgment or order shall be signed by the court unless the form thereof has been settled on motion on notice to all parties affected thereby who are not in default for failure to appear, or unless the written approval of such attorneys or parties to the form thereof is endorsed thereon.

"'Our review of the meaning or scope of a court rule is de novo; we do not defer to the interpretations of the trial court . . . unless we are persuaded by [its] reasoning.'" In re Protest of Contract for Retail Pharmacy Design, 257 N.J. 425, 436 (2024) (quoting State v. Tier, 228 N.J. 555, 561 (2017)). Appellate courts must consider a Rule's plain language "'and 'ascribe to the [words of the rule] their ordinary meaning and significance . . . and read them in context with related

---

[2] We note that while FPP asserts it did not receive advance notice of the consent order, the Sisters contend that FPP received such notice via eCourts and FPP did not object.

provisions so as to give sense to the [court rules] as a whole.'" DiFiore v. Pezic, 254 N.J. 212, 228 (2023) (quoting Wiese v. Dedhia, 188 N.J. 587, 592 (2006)).

Here, FPP had been dismissed from this litigation at the time of the May 2024 consent order such that notice was not required. As we discussed above, by that time, all of FPP's affirmative claims had been properly dismissed on summary judgment. While those orders did not expressly dismiss FPP from the litigation, the court's handwritten note on the November 17, 2023 order stated that FPP "ha[d] been dismissed from [this] matter."

To the extent FPP may have remained a party despite this language, such status was based only upon the Sisters' amended complaint, which provided that the Villa, and thus FPP, "will have an opportunity to provide this [c]ourt with input as to the requested relief, and so that they will be bound by the [o]rders to be entered in this matter."

Even if we regard FPP as a party at the time of the consent order, the court nonetheless properly entered the order even without notice to FPP because, consistent with Rule 4:42-1(b), FPP was not "affected thereby." The order and accompanying settlement agreement did not diminish FPP's then-afforded sewage allocation or its right to expand. Significantly, the settlement agreement

provided that FPP "shall maintain whatever rights it may have, pursuant to contract or otherwise . . . ."

To the extent FPP argues it had contractual rights affected by the consent order and settlement agreement because Paragraph 28 purported to grant it half of the excess sewer capacity, we reject this claim based on the current record and particularly considering the lack of a justiciable controversy upon which the issue can be properly addressed. Matters that are dismissed based upon ripeness, as the claims here, can be refiled at the appropriate time as they become justiciable based upon a showing of real harm. See Matter of Firemen's Ass'n Oblig., 230 N.J. at 275 (providing that an actual controversy exists when the facts conclusively present issues affecting the parties' adverse interests). Accordingly, for the reasons provided, we find no error in the court's dismissal of FPP's counterclaims and crossclaims or in entering summary judgment and the consent order.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-3175-23